### In re Peter Randolph PERSKIN and wife, Allene E. Perskin, Debtors.

### Bankruptcy No. 380–00625–F.

United States Bankruptcy Court,
N. D. Texas,
Dallas Division.

Feb. 9, 1981.

Harold C. Abramson, Dallas, Tex., for Bank.

Jacob Davis, Dallas, Tex., for debtors.

Tim Truman, Fort Worth, Tex., Trustee.

## OPINION OF THE COURT

JOHN C. FORD, Bankruptcy Judge.

This case involves a Chapter 13 Plan objected to by the First National Bank in Dallas (Bank), as both secured and unsecured creditor. After reviewing the plan, taking testimony and hearing arguments from counsel and the standing trustee, the Court confirmed the plan.

The facts are not complex. Debtors filed a Petition and Plan under Chapter 13 of Title 11 of the United States Code, 11 U.S.C. §§ 109, 303 (1978), on August 20, 1980. On October 27, 1980, the Bank filed a multifaceted objection to confirmation of the Plan. Two features in the Plan proved controversial. First, the Plan provided for the debtors' retention of two credit cards outside the plan with payment on the re-

spective outstanding and future obligations to be likewise handled outside the plan. Second, the debtors valued the Bank's collateral (1979 Chrysler New Yorker) at a significantly reduced amount with payment projected over 36 months. The Bank's objections were as follows: that the Plan was not filed in good faith because outside Plan payments proposed by the debtor unfairly discriminated against other creditors; that outside Plan provisions destroyed the Plan's feasibility; and, that the collateral's abnormally intensive use would cause it to rapidly decrease in value so that it would be worth nothing long before expiration of the 36 month pay out. In addition, the Bank objected that the debtors' valuation of the Bank's security—a 1979 Chrysler New Yorker—was woefully understated.

The confirmation hearing was held on November 4, 1980. Present at the hearing were the Bank, the attorney for the debtors, and the standing trustee. The trustee recommended confirmation of the Plan. The Court confirmed the Plan. Subsequent to the confirmation hearing, the debtor discovered irregularities in his plan as confirmed. Specifically, in the Plan originally confirmed the Court's increased valuation of the Bank's collateral above the valuation contained in the debtors' plan inflated the monthly payments to the secured creditor, without providing the unsecured creditors an adjustment enabling their receipt of an acceptable dividend. The transcript of the proceeding (p. 58) reveals that the debtor attempted to have the payment order extended for the unsecured creditors' benefit but did not succeed. Despite the confusion at the confirmation hearing, this Court's action denying the motion was intended only to deny extending the payment period as to the Bank. To correct this discrepancy, on January 7, 1981, the debtors moved to extend the months. Under this extension, only the unsecured creditors will be paid beyond the thirty-six months. At completion of the forty-eight month plan, the

unsecured creditors will have received an eighty-four percent dividend. On January 14, 1981, the Order granting the extension to forty-eight months for the unsecured creditors was signed *nunc pro tunc* by this Court, effective, as of the date of confirmation. The issues raised by the Bank will be analyzed and decided below.[1]

## I. WHETHER THE DEBTORS' ATTENDANCE AT CONFIRMATION HEARING IS REQUIRED?

Debtors' absence raises the question of whether a debtor's presence at the confirmation hearing is a prerequisite to confirmation of the plan. In that this court has an independent duty to determine that all the requirements of § 1325(a) are satisfied prior to confirming the plan, *See In Re Williams*, 3 B.R. 728, 1 C.B.C.2d 879 (Bkrtcy., N.D.Ill.1980); *In re Cooper*, 3 B.R. 246, 1 C.B.C.2d 813 (Bkrtcy., S.D.Cal.1980) the debtor's failure to attend the confirmation hearing will be considered below notwithstanding the Bank's decision not to object to confirmation on that basis.[2] As a preface to analyzing this question, this Court notes that of the six requirements that the debtor must meet prior to the court entering an Order of Confirmation, only two of the requirements can be interpreted as requiring the court to look to related law in deciding the issue of debtor's attendance at confirmation. Subsection one of § 1325(a) requires that the plan comply with all applicable provisions of the Bankruptcy Code. However, subsection one is restrictive in its language and requires the court to test only the plan against the applicable provisions of the Chapter and title. Thus, debtor's presence at confirmation is not really relevant to subsection one. Subsection three requires that the plan be proposed in good faith and not by any means forbidden by law. It is this subsection which allows this court to determine the question of debtor's attendance at confirmation. Although subsection three is

1. This decision constitutes findings of fact and conclusions of law in accordance with 11 U.S.C. Rule 752.

2. As will be seen, it is doubtful whether such an objection would be valid even if raised.

most often interpreted as encompassing questions about the debtor's intent in submitting the plan, this court believes that if applicable law requires debtor's attendance at confirmation, it is the vehicle of subsection three which requires denial of confirmation.

In filing a Chapter 13 petition and plan, a debtor is expected to perform certain duties before his plan will be confirmed. If he performs these duties, he is entitled to have his plan confirmed if it satisfies § 1325.

Certain duties are explicitly required of the debtor. Section 343 requires the debtor to attend the first meeting of creditors so that he may be examined under oath by creditors. Section 343 is made applicable to Chapter 13 cases by Section 103(a). Thus, failure to attend the § 341 meeting will result in denial of confirmation, § 1325(a)(1), and by logical extension, denial of discharge. The debtor in a Chapter 13 is also required to file a plan, § 1321. Besides explicitly requiring such action of the debtor, there could be no confirmation of a plan under § 1325 if none existed. Lastly, the Code clearly requires the debtor to attend the discharge hearing. Section 521, by way of Section 524(d), makes the debtor's attendance at the discharge hearing mandatory. Failure to attend results in no discharge being granted. Section 524(d); Section 1328. nowhere in the Code wherein the debtor's duties are enumerated is attendance at confirmation mentioned.

The subject of attendance at confirmation, however, was not ignored by Congress. The trustee in a Chapter 13 case is required to attend confirmation, § 1302(b). Although not specifically required to attend confirmation by § 1324, a creditor objecting to confirmation must, by implication, attend the confirmation hearing in order to have his grounds for objection heard. The filing of an objection to confirmation would seem fruitless if the objecting party failed to pursue his objection at the hearing specifically set aside to protect his interest. *See*: Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 142, U.S.Code Cong. & Admin. News 1978, 5787.

The above discussion poses the question of whether the Code implicitly requires that the debtor attend confirmation. Unfortunately, it is not so easy to reach a conclusion on this matter as it is in finding that an objecting creditor must be present at confirmation. In support of finding debtor's attendance at confirmation mandatory, it stands to reason that the confirmation hearing will devolve into an exercise in futility if the debtor can treat it with disdain. One can perceive a case in which a convention of creditors appear at confirmation fully prepared to test debtor's plan, only to have debtor thumb his nose at them with his absence. Granted, it portends increased debtor-creditor hostility and possible loss of respect for the present bankruptcy system, but such concerns can be routinely reduced if not eliminated.

First, the confirmation hearing is not designed to act in the debtor's benefit. It is not, as is the case in a Chapter 7 discharge hearing, designed to inform the debtor of the legal effect of his bankruptcy and to protect him from ill advised action. Rather, the confirmation hearing is a creditor forum designed to safeguard creditor interests at the expense of the debtor. Second, at the hearing the court is to consider why the plan does not conform to requirements of Chapter 13 or why the debtor did not comply with the required pre-confirmation procedures. Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 142. Nothing in Section 1322 requires debtor's attendance at the hearing in order for the court to confirm a complying plan. In addition, Bankruptcy Rule 13–213 requires that objections to confirmation of the plan be filed prior to confirmation. Bankruptcy Rule 13–213. Furthermore if one is to object to confirmation on the grounds that the debtor has breached pre-confirmation procedures, that too must be filed prior to confirmation. *Id.* It is difficult to conjure a situation in which a creditor could object to confirmation of the plan prior to the confirmation hearing and have that objection timely filed yet base that objection on the grounds that the debtor did not attend the confirmation hearing.

Thus, the apparent oddity of not requiring the debtor to attend the confirmation hearing is one created by the draftsmen of the Code. In truth, however, such a nonrequirement is far from peculiar. After all, the confirmation hearing is for the creditors, not the debtors. In that the debtor's attendance at confirmation is not vital for a creditor to formulate the grounds for his objection to the plan on the debtor's prehearing conduct, there seems little reason for requiring the debtor to appear. If the creditors attended the § 341 meeting, examined the debtor there, and perused his sworn plan and sworn statements, a credible objection to confirmation is possible. Should it not be possible or should the creditor require debtor's testimony to crystallize and enhance the strength of his objection, he has the option of subpoenaing the debtor. The legislative history pertinent to § 1324 supports this conclusion. It says that "an objection to confirmation is predicated" on failure of the plan or the procedures employed *prior to confirmation* to conform with the requirements of Chapter 13. Senate Report No. 95–989, 95th Cong., 2d Sess. 1978 (142) (emphasis added.) Thus, the creditor can have his day at the confirmation hearing without the debtor's company. In fact, the creditor may have an even better day at confirmation without the debtor, and for that reason, it is in the debtor's best interests to attend and test the veracity of the creditor's objection. Thus, it is best for the debtor that he attend, but it is not required.

The last point to consider is whether the nonappearance of the debtor will result in objection to confirmation being sustained by default. Bankruptcy Rule 13–213 recites that objections to confirmation are governed by Bankruptcy Rule 914. Rule 914 makes applicable for contested matters Bankruptcy Rule 755 which governs default judgments in the Bankruptcy Court. For the most part, general principles enunciated for default judgments in Federal Civil proceedings are followed in interpreting Bank-ruptcy Rule 755. Whether a default judgment is proper in the context of an objection to confirmation of a plan will not be decided here. Suffice it to say that one would be hard pressed to find a party in default when his counsel is prepared to proceed at the scheduled hearing. Such was the case here and precluded further consideration of this issue.

In conclusion, this Court finds that as a matter of law, a debtor's attendance is not required, and that if objection to confirmation is to be sustained, it must be sustained on other grounds. Furthermore, although not necessary, it was this Court's decision to use its equitable powers to excuse debtors' attendance at confirmation due to illness in debtors' family. Finally, this Court finds that creditor did not suffer any detriment at the hearing due to debtors' nonappearance.

## II. WHETHER PLAN WAS FILED IN GOOD FAITH?

The Bank objected to confirmation because it contended that the Plan was not filed in good faith. Specifically, the Bank argued that because creditors Carte Blanche, Inc. and Preston State Bank are to be paid outside of the plan, the payment plan unfairly discriminates against the unsecured creditors being compensated within the Plan.

The issues of the Plan's good faith and unfair discrimination against the unsecured creditors are inseparable as pled by the Bank. Although the issue of good faith in a plan usually focuses on the percentage of payout and whether such payout constitutes substantial payment *See In Re Burrell*, 6 B.R. 360 (D.C.N.D.Cal.1980), the Bank here alleged that the discriminatory treatment of creditors generated by the plan required a finding of "bad faith." In that the Bank did not plead that its dividend as an unsecured was inadequate, and in light of the extension order, this decision will not consider whether the plan makes substantial payments.[3] Determination of good faith

---

**3.** It is significant to note the payment to the secured creditors under the plan as extended will be 84%.

here will only address the issues of unfair discrimination as it relates to good faith.

The applicable Code Sections relating to the issue of unfair discrimination address Plan classification of claims. Section 1322 governs claim classification in a Chapter 13 Proceeding and reads in pertinent part:

"§ 1322. Contents of Plan

"(a) The Plan shall . . .

"(3) if the plan classifies claims, provide the same treatment for each claim within a particular class.

"(b) Subject to subsections (a) and (c) of this section the plan may—

"(1) designate a class or classes of unsecured claims, as provided in Section 1122 of this title, but may not discriminate unfairly against any class so designated, . . ."

*Id.* at § 1322.

Section 1122 provides

"§ 1122. Classification of claims or interests.

"(a) Except as provided in subsection (b) of this section a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

"(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience . . ."

Id. at § 1122.

These two sections allow debtors to segregate certain claims or interests so long as those claims grouped together are substantially similar. *In re Iacovoni*, 2 B.R. 256, 5 B.C.D. 1270 (Bkrtcy., D.Utah 1980) In addition, the creation of separate class of creditors will be sanctioned if the classification does not unfairly discriminate against those creditors which fall outside of the class. *Matter of Curtis*, 2 B.R. 43 (Bkrtcy., W.D.Mo.1979) Thus § 1122(a) prevents discrimination occasioned by amalgamating dissimilar claims into one class to gerrymander a plan around typical multi-creditor

difficulties faced by debtors. Section 1322(b)(1) focuses on the different situations wherein more than one class exists and the plan, by irrationally based dividends, attempts to provide more favorable treatment to one class. Although § 1322(b)(1) literally addresses discrimination between classes, logically it is suited to govern situations where payments to creditors outside the plan "discriminate unfairly against any class so designated."

Despite the fact that § 1322 and § 1122 prevent the debtor from running roughshod over creditors by creditor classification, the two sections jointly do not compel that all substantially similar creditors be classed together. *Collier on Bankruptcy*, 14 Ed., Vol. 5, p. 1122–4. Claims "substantially similar" are similar in legal character or effect against the debtor's estate. *Id.* A reasoned interpretation of § 1322's "unfair discrimination" language would permit discrimination between claims, even if similar in nature, as long as such discrimination was not unfair. To interpret otherwise would result in a superfluous existence for § 1322. *Id.* Support for this interpretation is extensive. *See In re Sutherland*, 3 B.R. 420, 6 B.C.D. 13 (Bkrtcy., W.D.Ark.1980) (discriminatory treatment of unsecured creditors not unfair); *Matter of Curtis*, 2 B.R. 43 (Bkrtcy., W.D.Mo.1979) (discrimination through extra payment for child support not unfair); *In re Kovich*, 4 B.R. 403, 2 C.B.C.2d 203 (Bkrtcy., W.D.Mich.1980) (discrimination unfair); *In re Fizer*, 1 B.R. 400 (Bkrtcy., S.D.Ohio 1979) (classification wherein partially secured creditors received 100% and unsecured creditors received 30% held unfair); *In re Cooper*, 3 B.R. 246, 6 B.C.D. 81 (Bkrtcy., S.D.Cal.1980) (full payment of an unsecured claim of secured creditor held to discriminate unfairly against unsecured creditors receiving 70% dividend when no justification for discrimination shown); *In re Gay*, 3 B.R. 336, 6 B.C.D. 149 (Bkrtcy., D.Colo.1980) (substantial discrimination between classes of unsecured creditors so as to avoid criminal prosecution not adequate justification). *Contra In re Iacovoni*, supra.

The cases which have examined debtors' discrimination of unsecured creditors primarily have approached the issue in two ways. The first analyzes the discriminated creditor's dividend under the plan in relation to his entitlement if instead the debtor chose Chapter 7 liquidation. This approach assumes that because the creditor stands to benefit more under the Chapter 13 plan than under a hypothetical Chapter 7 liquidation, no unfair discrimination exists. *Sutherland, supra* at 13 (dicta); *Haag, supra* 146. This court finds that although such an analysis has merit of a practical nature, it cannot be adopted as the sole test. To do so would ignore Section 1322's language allowing some discrimination and reduce it to an unnecessary restatement of Section 1325(a)(4). In addition, it fails to address the critical discrimination issue. Consequently, the analysis in *Sutherland* is not adopted here.

The second approach, more in tune with the Code and its legislative history, recognizes that discrimination between creditors is proper in limited circumstances. Discrimination between classes is permitted when its purpose is rationally based or reasonable. *In Re Haag*, 3 B.R. 649, 2 C.B.C.2d 144 (Bkrtcy., D.Or.1980); *Kovich, supra* at 107; This necessitates a case by case analysis and rejects adoption of a blanket rule as proposed in some decisions, *Iacovoni, supra; Sutherland, supra.* Under the rational basis approach, the comparative benefit to a discriminated creditor under Chapter 13 as opposed to Chapter 7 is only one of many factors to be considered. *Kovich, supra* at 207. Other questions include: What is the reason for the classification? Is the classification essential to the plan? Has the debtor proposed the classification in good faith? Is the payment to the class meaningful? Is the proposed classification important to the debtor's "fresh start"?

In the case at bar, the plan discriminates between two *de facto* classes. Although Carte Blanche and Preston State Bank are to be paid outside of the plan and hence are not classified by the plan, they nevertheless receive identical favorable treatment to the discrimination of the unsecured creditors in the plan. The question then becomes whether such discrimination is unfair.

Debtor's business is that of a traveling salesman. In his business he must pay his way to reach the customer to whom he makes his sales. Mobility is crucial to earning his commission. In this case, the debtor's employer reimburses him for the expenses he incurs while on the road making sales. To that end the two credit cards are of substantial benefit. The credit cards' receipts provide the precise documentation which will serve as proof for expense reimbursement to debtor's employer. The credit cards provide a medium of exchange which the financially strapped debtor might otherwise not have. If the debtor was to rely solely on available cash in order to conduct his business, his finely tuned plan would be thrown out of balance. As it is drawn now, the plan leaves little cushion enabling the debtor to hoard cash for travel funds. Thus, debtor has classified the two classes differently so that the plan will work. Without the plan drawn as it is, there is little chance that the creditors under the plan will be paid to the extent now envisioned. Debtor's exclusion of the credit cards from the plan is a good faith attempt to construct a workable and meaningful payment plan based on his current employment situation. Whether this is the only plan possible is not before the Court. This plan discriminates, but the discrimination is reasonable.

### III.   WHETHER THE PLAN IS FEASIBLE?

Bank objects to confirmation of the plan on the grounds that debtors' plan is not feasible in view of debtors' earnings, budget and indebtedness. If true, debtors' plan could not be confirmed without violating Section 1325(a)(6).[4]   Bank's specific

---

4. § 1325.   Confirmation of Plan
    (a) The court shall confirm a plan if—
     .     .     .     .     .

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

grounds for attacking the plan's feasibility was not stated by its pleadings or in court, so it is here assumed that this objection is based on the Plan's failure to provide for inflation.

The feasibility of a Chapter 13 payment plan has been little litigated, and consequently, guidance on the issue is sparse. The more frequent objection of bad faith questions the debtor's sincerity in paying so little when debts are so great, whereas the feasibility issue involves the propriety of attempting to pay so much with so little.

The cases addressing this issue generally hold that where debtors' plan is tightly constructed with little cushion for unexpected contingencies, Section 1325(a)(6) remains unsatisfied. *See In Re Lucas*, 3 B.R. 252 (Bkrtcy., S.D.Cal.1980) (cushion of $2.00 inadequate when amount budgeted for medical expenses and clothing held not to satisfy 1325(a)(6)); *In re Hockaday*, 3 B.R. 254 (Bkrtcy., S.D.Cal.1980) (cushion of $10.00 per month inadequate when nothing budgeted for medical expenses and amounts budgeted for utilities and phone are unreasonably low); *In re Ballard*, 4 B.R. 271 (Bkrtcy., E.D.Va.1980) (1325(a)(6) not satisfied when debtors' plan requires payments which cannot be made in view of debtor's cash flow deficit); *In re Barnes*, 5 B.R. 376 (Bkrtcy., D.C.1980) (budget which lists expenses unreasonably low fails to account for inflation, and proposed zero cushion for debtor does not comply with 1325(a)(6); *Matter of Nance*, 4 B.R. 50, 2 C.B.C.2d 963 (Bkrtcy., W.D.Mo.1980) (Plan which does not compensate for future expiration of resources is not feasible within meaning of 1325(a)(6).

Debtors' plan proposes monthly payments of $400.00 to the standing trustee. These payments are drawn from a monthly take-home pay of $2050.00 reduced by monthly expenses of $1650.00. This leaves a monthly cushion of zero dollars with which to meet unexpected expenses. Based on these figures and the above cited case law, one may choose to conclude that the plan's feasibility will be compromised in the future by the inevitable ravages of inflation. As susceptible to inflation as this or any budget may be, a closer examination of the debtors' budget reveals a resiliency nonexistent in the above cited cases. Whereas the debtors in the above cases pared their expense budgets to bare bones in order to find the money to pay the trustee, this expense budget is far from skeletal in nature. Not extravagant by any means, the expense budget here nevertheless leaves a moderate cushion within which the upward spiral of expenses can climb. A cushion may be required, but it need not be listed under a separate heading.

By its very nature, a Chapter 13 payment plan balances debtor's present abilities against the future uncertainties confronting both the debtor and society. Inflation is inevitable if inestimable. As such, courts are faced with the dilemma of balancing a plan's feasibility against its good faith. The more money set aside by the debtor for the purposes of satisfying future unknown contingencies, the greater his danger of running afoul of the good faith requirement. *See Matter of Brown*, 2 C.B.C.2d 869 (Bkrtcy., S.D.N.Y.1980) (Debtor's income excess of $140.00 after plan payment violates good faith requirement.) A happy medium is ideal, but it is not always obtainable. To require all plans to demonstrate a cushion of funds denominated by a separate account after subtracting plan payments and expenses from take-home income creates a rigidity not intended by Congress. Had Congress intended such a test, it would have stated so much in 1325(a)(6)). Consequently, this Court finds, on the basis of examining the whole plan and the evidence presented at confirmation, that the payment plan is not too onerous for the debtors now nor does it evince future debtor inability to pay. On that basis, this Court finds the Plan to be feasible.

## IV. VALUE OF THE BANK'S COLLATERAL

The Bank asserts that the plan's valuation of the Bank's collateral (a 1979 Chrysler New Yorker) is understated. Specifically, Bank tendered the existence of a ready and willing buyer for the car and argued that if the debtor was allowed to keep the car under the plan, the court's valuation of the car should equal the amount the ready buyer was willing to pay.

Under the plan as submitted, the debtor valued the security at $4,375.00. To counter, the Bank tendered an automobile dealer willing to buy the car for $10,595—the balance owed by the debtor. It is with this particular dealer that the Bank has a repurchase agreement whereby the dealer agrees to buy back certain cars it sells which are financed by the Bank and which fall in default. This amount offered by the automobile dealer, some $6,220 above the debtors' valuation, was the Bank's perception of the security's value.[5]

Two things are wrong with the Bank's contention. First, the applicable Code Section governing the valuation of security, Section 506(a), allows the creditor a value on his security only to the extent of the debtor's interest. Section 506(a) states "An allowed claim of a creditor secured by a lien on property in which the estate has an interest, ... is a *secured claim to the extent of the value of such creditor's interest in the estate's interest* in such property." (emphasis added) Section 506(a) thus mandates that the security's valuation be based on the value the security has to the debtor's estate. Any deal which the creditor can strike with a third party may be evidence of value, but it is not positive proof of value.

In this regard, the repurchase agreement is an extraneous agreement relevant to the determination of the 506(a) issue only to the extent it offers some evidence of value. The Bank's attractive reasoning, by which it points to a willing buyer at X price as proof that X indicates value, oversimplifies and distorts what the repurchase agreement represents.

To argue that money paid to Bank pursuant to repurchase agreement equals the car's value confuses the repurchase agreement's purpose in the stream of commerce. Here, the $10,595 represents two things: the value of the car and a "risk premium" paid by the car dealer to the Bank so that the Bank will continue to finance cars sold by the dealer to the public. By virtue of the agreement, the dealer agrees to repurchase from the Bank the car sold by the dealer and financed by the Bank, but which falls in default. The amount paid by the dealer is equal to the debt owed. That amount of money over the actual value of the car is a risk premium paid to the Bank.

Within the context of the whole financing agreement, the future debtor pays the maximum legal interest rate to the Bank and the dealer promises a future risk premium should the debtor default. Just as retail price of an item includes overhead, sales commissions and advertising and consequently is questionable as an indication of value, the repurchase price prepared to be paid here represents a distortion of the car's value. *See In Re Jones*, 5 B.R. 736, 6 B.C.D. 965 (Bkrtcy., E.D.Va.1980).

From the Bank's perspective, certain consumers seeking credit are not credit worthy even at the maximum interest rate allowed by law. In the face of this determination, the consumer cannot buy the item, and the car dealer loses a sale. In a sense, both are unsatisfied. The repurchase agreement between the bank and dealer makes the consumer, the dealer and finally, the bank, happy. The repurchase agreement provides

---

5. This Court readily embraced a proposal whereby the Bank could take possession of the car, return it to the dealer and receive an amount equal to the outstanding debt. As a condition to the Bank being allowed to implement the repurchase agreement, the Bank would, according to the proposal, finance a smaller and more economical car for the debtor. A financing ceiling of $7,000 would have been established. Under this arrangement, the debtor would pay for a new car which would have a longer life than the Chrysler and the Bank would have already been compensated under the original repurchase agreement. The Bank rejected the proposal.

the bank with assurances that an added sum of money will go to the bank should the consumer default. This accomplishes two things. It makes it worthwhile for the bank to loan money because the interest paid by the consumer and risk premium commitment of the dealer reduces the bank's risk within their acceptable limits. Secondly, it permits acceptable financing without running afoul of the State's usury laws.

On repurchase, the dealer theoretically pays risk premium only. The rest of the transaction with the bank involves a number of accounting entries on the dealer's balance sheet. First, the dealer exchanges cash (in addition to the risk premium paid to the bank) for an automobile of roughly equal value, thus exchanging cash for inventory. Second, he sells that automobile to replace the cash paid to the bank for the car, debiting inventory and crediting cash. After these two steps are completed, all the dealer has done is pay the bank a risk premium and nothing more. Naturally, the dealer hopes few repurchases will occur and any that are necessary will be absorbed in the volume of sales stimulated by the ready financing. Therefore, the repurchase agreement price is poor evidence of the car's value in that it includes the elusive risk premium.

This analysis of the repurchase agreement can be analogized to the sale of a house and the "points" paid by the seller to the finance company. For example, a seller who sells his home pays "points" to the lending institution in part to induce the lender to finance the house for the buyer. A portion of that money paid as "points" is risk premium. Unlike the repurchase situation here, the risk premium in a home sale is collected at closing and not after default. As in the auto repurchase situation, "points" allow the lender to insure against risk without violating the State's usury laws. Points further create a market for the buyer and seller. And in both cases, when an all cash sale is consummated, the finance middleman is absent, no risk exists

and consequently, no one pays a risk premium.

In view of the above, the value of the collateral is not the amount the dealer is willing to pay the bank. The testimony at confirmation revealed that the value of the car is somewhere in the range of $5,000–$7,000. For purposes of this collateral and limited to the facts presented, this Court finds that the value of the 1979 Chrysler New Yorker is $6,700.00.[6]

## V. BANK'S REQUEST FOR PAYOUT TERM OF LESS THAN 36 MONTHS

As originally bargained for, the debtors' finance contract with the Bank provided for forty-eight monthly payments at $265.56 a month until the purchase price of $12,746.80 was retired. The Bank asserted that had it known at the contract date that the debtor was going to use the car as a traveling salesman, it never would have permitted the forty-eight month financing. Because of this misunderstanding and because fourteen months since contract date have elapsed, the Bank requested that the repayment period for the car be reduced to less than thirty-six months.

In support of its contention, the Bank offered evidence that the car could not withstand thirty-six months of traveling salesman use. In addition, the Bank intimated that at financing not only did it not know that the debtor would use the car as a traveling salesman, but it did not even know that sales was his occupation. The evidence in support of these two contentions was inconclusive at best. It is curious that the Bank did not learn of debtor's occupation when financing was arranged. If it did know his vocation, it is hard to fathom its surprise to learn that the debtor would use the car in his business.

In view of the above, this Court finds that the Bank has not met its burden of proof by showing that the car is deteriorating at an accelerated rate not contemplated on the date of financing. A thirty-six month payout is acceptable.

---

**6.** Add-on interest is set at 7.5 percent.

It is therefore, for the foregoing reasons,

ORDERED that the debtors' Plan or Arrangement herein be, and it is hereby, confirmed pursuant to § 1325 of the Bankruptcy Code.