**In re Terry R. COOK and Gayle H. Cook dba Cook Excavating, Debtors.**

**Bankruptcy No. 83C–00198.**

United States Bankruptcy Court, D. Utah.

March 30, 1984.

Mark R. Emmett, Burton & Schiess, Salt Lake City, Utah, for debtors.

George W. Pratt, Greene, Callister & Nebeker, Salt Lake City, Utah, for Zions First National Bank.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### INTRODUCTION

This case requires the court to decide the value of a car for purposes of 11 U.S.C. § 1325(a)(5)(B)(ii).[1]

### FACTS AND PROCEDURAL BACKGROUND

On August 2, 1982, debtors bought a new 1982 Datsun 200SX from Washburn Motor Company for a cash price of $9,464.00. Zions First National Bank financed the purchase. Zions and Washburn were operating under a repurchase agreement which provided that if a car buyer failed to pay Zions, Zions could repossess the car, deliver it to Washburn, and receive from Washburn the full unpaid balance owing on the contract.

Debtors filed a petition for relief under Chapter 13 on January 21, 1983, five and one-half months after buying the car. The parties stipulate that Zions holds a perfected security interest in the car and that at all times relevant to this matter the debt owed to Zions exceeded the car's value.

On September 14, 1983, the court held a hearing on the confirmation of debtors' plan, which proposes to fix Zions' allowed secured claim at $6,975.00. The court found that the plan could be confirmed but took under advisement the issue of the value of the car. On September 26, 1983, the court entered an order confirming the plan and provided for payments to Zions of not less than $6,975.00.

The evidence before the court relating to the value of the car is summarized below:

(1) $9,464.00 Cash purchase price on August 2, 1982.

(2) $8,150.00 N.A.D.A. Official Used Car Guide average retail value[2] on September 14, 1983, the date of the confirmation hearing, with an adjustment upwards based on Zions' appraiser's examination.[3]

(3) $6,975.00 N.A.D.A. average trade-in value[4] on January 21, 1983, the date of filing for relief.

(4) $6,925.00 N.A.D.A. average trade-in value on September 14, 1983, the date of the confirmation hearing, with adjustments upwards by Zions' appraiser.[5]

---

1. "The court shall confirm a plan if—with respect to each allowed secured claim provided for by the plan—the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim."

2. N.A.D.A. average retail value is defined to be the "latest average retail values based on actual sales reports from new and used car dealers throughout the territory for which the Guide is designated."

3. The upward adjustments were based on the good condition of the car, low mileage and the fact that it is a deluxe model.

4. N.A.D.A. average trade-in value is defined to be the "latest average wholesale values based on auction reports and dealer wholesale reports throughout the territory for which the Guide is designated."

5. The appraiser began with the N.A.D.A. base figure of $5,650.00 and added $1,275.00 for features and low mileage.

(5) The parties have stipulated that the car is depreciating at the rate of $130.00 per month.

## DISCUSSION

The parties presented two issues for decision: first, whether the car should be valued as of the date of the confirmation hearing or as of the date of filing and second, whether the value of the car for the purposes of this hearing is best reflected by the N.A.D.A. retail value on the date of the confirmation hearing, N.A.D.A. average trade-in value on the date of the confirmation hearing, or N.A.D.A. average trade-in value on the date of filing.

■ *Valuation Date.* I agree with Collier's conclusion that in these circumstances the car should be valued as of or close to the effective date of the plan:

> The value of the subject property should be determined as of the date to which the valuation relates. For example, if the valuation is to determine the amount of a secured claim for purposes of a chapter 11 or 13 plan, the value should be determined as of, or close to, the effective date of the plan.

3 COLLIER ON BANKRUPTCY ¶ 506.04 at 506–32 (15th ed. 1983). In this case the effective date of the plan is defined by the plan to be the date of confirmation.

Collier's conclusion is consistent with the better reasoned cases. *See In re Klein,* 10 B.R. 657 (Bkrtcy.E.D.N.Y.1981); *In re Fulcher,* 15 B.R. 446 (Bkrtcy.D.Kan.1981); *In re Jones,* 5 B.R. 736 (Bkrtcy.E.D.Va. 1980); *see also* 1 NORTON BANKR.L. & PRAC. § 28.24 at 18 n. 1.60 (Supp. Oct. 1983); *contra In re Adams,* 2 B.R. 313 (Bkrtcy.M.D.Fla.1980); *In re Van Nort,* 9 B.R. 218 (Bkrtcy.E.D.Mich.1981); *In re Willis,* 6 B.R. 555 (Bkrtcy.N.D.Ill.1980); *In re Kennedy Mortgage Co.,* 23 B.R. 466 (Bkrtcy.D.N.J.1982).

■ While some flexibility in this rule may be required to account for those cases in which equity demands a different valuation date; *see* Bowman & Thompson, "Secured Claims Under Section 1325(a)(5)(B): Collateral Valuation, Present Value, and Adequate Protection," 15 IND.L.REV. 569, 577–580 (1982); Norton, *supra; In re Pennyrich International, Inc.,* 473 F.2d 417 (5th Cir.1973), in the ordinary Chapter 13 case involving the valuation of a car, the date of the confirmation hearing will be the proper date for fixing the car's valuation. Section 1325(a)(5)(B)(ii) requires the court to compare, as of the effective date of the plan, the value of the deferred cash payments with the amount of the allowed secured claim. This is done at the confirmation hearing. As a practical matter this comparison can best be done if the value of the car and the value of the property to be distributed under the plan are set as of the same date. *See* Kennedy, "Cramdown of the Secured Creditor Under Chapter 13 of the Bankruptcy Code," 1982 ANN.SURV. OF BANKR.LAW 253, 258. Moreover, in this district creditors with liens on cars frequently seek and obtain orders requiring debtors to make monthly adequate protection payments to compensate for postfiling but pre-confirmation depreciation. Using the filing date as the date for valuations under Section 1325(a)(5)(B) would require debtors to pay twice in such cases: once to compensate for depreciation and again because value would be fixed as of the date of filing.

*Method of Valuation.* In this case, debtors and Zions agree on one point: that the court should select a value for the car which measures the cost to the debtors of replacing it.[6] The parties disagree, however, on the evidence the court should accept as proof of debtors' replacement cost.

Debtors argue that if they were forced to replace their car, they would probably do it by purchasing a car from a private party

---

**6.** *See* Debtor's memorandum, page 4 ("Another valuation standard which has emerged from the reported cases (and the standard which debtor urges the court to adopt) is that of replacement cost to the debtor."); Zions' memorandum, page

12 ("The appropriate measure of value in chapter 13 confirmation is the value to the debtor of having the use of the property—what it would cost the debtor to replace it.").

because, having recently filed a Chapter 13 petition, it would be difficult or impossible for them to obtain the financing required to purchase a car from a dealer. Debtors, however, submitted no direct evidence to show what price they would have to pay a private party. Instead, debtors argued that the N.A.D.A. wholesale/average trade-in value "is representative of the amount debtors would be required to pay in order to obtain the same vehicle on the open, private market." Debtor's memorandum, page 6. Debtors did not explain why N.A.D.A. wholesale value represents the price they would have to pay on the private market.

Zions argues that the best evidence of the price debtors would have to pay to replace their present car with a similar one is the N.A.D.A. retail price as adjusted by Zions' appraiser. But Zions did not explain why the court should assume that debtors would replace the car, if required to do so, by purchasing from a dealer.

These arguments lead to a conundrum: even if replacement cost is the appropriate approach to valuation, is replacement cost best represented by wholesale, retail, or some other price? Fortunately, however, the court need not resolve that question.

■ The purpose of collateral valuation under Section 1325(a)(5)(B)(ii) is not to assure that secured claimants will receive under the plan as much money as debtors would have to spend to replace the collateral. Instead, the purpose of collateral valuation under Section 1325(a)(5)(B)(ii) is to protect secured claimants from loss by assuring that they will receive under the plan as much money, or its equivalent, as they would receive if they were permitted to sell the collateral in a commercially reasonable manner.[7] Replacement cost is not an appropriate standard.

This conclusion follows from House Report 95–595, 95th Cong., 1st Sess. 124 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6085, which explained the purpose of the valuation to be performed under Section 1325(a)(5). Congress was concerned that because of the threat of repossession debtors under former Chapter XIII were being required to pay in full debts secured by collateral with a high replacement cost but a low resale value:

> Most often in a consumer case, a secured creditor has a security interest in property that is virtually worthless to anyone but the debtor. The creditor obtains a security interest in all of the debtor's furniture, clothes, cooking utensils, and other personal effects. These items have little or no resale value. They do, however, have a high replacement cost. The mere threat of repossession operates as pressure on the debtor to pay the secured creditor more than he would receive were he actually to repossess and sell the goods.[8]

The valuation provisions of the proposed legislation were meant to remedy this problem by requiring Chapter 13 debtors to pay as a secured claim only the amount the secured creditor would receive upon repossession and sale of the collateral. The remaining balance of the claim would be paid along with other unsecured claims. Thus, Section 506(a), at least in this con-

---

7. Most authorities agree with this formulation, although there are minor differences in terminology and approaches to evidence. *See* Collier, *supra;* Kennedy, *supra;* Bowman & Thompson, *supra; Memphis Bank & Trust Co. v. Walker,* 14 B.R. 264 (D.C.W.D.Tenn.1981); *Adams, supra; In re Crockett,* 3 B.R. 365 (Bkrtcy.N.D.Ill.1980); *In re Jones, supra; In re Cooper,* 7 B.R. 537 (Bkrtcy.N.D.Ga.1980); *In re Van Nort, supra; In re Beranek,* 9 B.R. 864 (Bkrtcy.D.Colo.1981); *In re Klein, supra; In re Clements,* 11 B.R. 38 (Bkrtcy.N.D.Ga.1981); *Compare In re Davis,* 14 B.R. 226 (Bkrtcy.D.Me.1981) (trucks and trailers in Chapter 11 case; "506(a) seems to envision

an archetypical valuation premised on a simulated conversion of the collateral into cash in the most commercially reasonable manner practicable in the circumstances"); *In re American Kitchen Foods,* 2 B.C.D. 715 (Bk.D.Me.1976) (Chapter XI case).

8. Although this language mentions furniture, clothes, cooking utensils and other personal effects and does not mention cars or appliances, the statute makes no distinction between types of collateral.

text, is intended to place a value on the collateral equal to its value *to the creditor:*

> The bill requires the court to value the secured creditor's interest. To the extent of the value of the security interest, he is treated as having a secured claim, entitled to be paid in full under the plan, unless, of course, he accepts less than full payment. To the extent that his claim against the debtor exceeds the value of his collateral, he is treated as having an unsecured claim, and he will receive payment along with other general unsecured creditors.

H.R.Rep. No. 95–595, *supra.* A rule requiring valuations under Section 1325(a)(5)(B) to measure the replacement cost of collateral to the debtors would defeat the design of Congress by giving secured creditors leverage they were not meant to have.

Zions argues that the court must use replacement cost as a measure of value in this case because of the following language of Section 506(a): "Such value shall be determined in light of ... the proposed ... use of such property." The proposed use in this case is personal use by the debtors. The court must determine the value of the car in light of this proposed use, Zions argues, and because the value to the debtors of this proposed use is equal to the cost of replacing the car, replacement cost is the measure of value.

This argument, however, is premised upon the assumption that the purpose of valuations under Section 1325(a)(5)(B)(ii) is to discover value to the debtor. For the reasons explained above, this assumption is not correct.[9]

Thus, the court must respectfully disagree with the analysis, relied upon by Zions

in this case, of *In re Reynolds,* 17 B.R. 489 (Bkrtcy.N.D.Ga.1981).[10] In *Reynolds,* Chapter 13 debtors moved for confirmation of their plan over the objection of a claimant holding a lien on their car. The secured claimant argued, among other things, that the car's value should be fixed at retail value. The court agreed with this argument based upon the following reasoning:

> The debtors' plan is to retain the vehicle and continue to use it to maintain debtors' employment status and for personal use over the life of the plan as allowed under 11 U.S.C. § 1325(a)(5)(B). Applying a liquidation (wholesale) value standard on this vehicle would be inconsistent with the continued use of the vehicle and the rehabilitative purpose of this Chapter 13 plan. The value of the creditor's claim under § 506(a) is enhanced by the proposed continued use of the property to help maintain employment and thereby effectuate the debtors' performance under the plan. The continued use of the vehicle by the debtor during the period of the proposed plan demands a rehabilitation value consistent with the "going concern" of the Chapter 13 debtor. The retention of the vehicle enables the debtors to avoid the necessity of replacement transportation. The debtors have made a conscious decision to keep and pay for the vehicle rather than surrendering it under § 1325(a)(5)(C). In this instance, the debtors' proposed retention and use of the vehicle pursuant to a Chapter 13 plan connotes a going concern value. Thus, the retail, replacement cost standard is the appropriate measure of value under § 506(a).

This reasoning is not persuasive because its underlying premise, that the purpose of

---

9. In unusual circumstances, however, "such as where the debtor filed bankruptcy shortly after purchasing an item, retail price may be an appropriate initial measure" of value. *Norton, supra* at n. 1.50. Other unusual circumstances might include cases involving custom-made property. *See Sears, Roebuck & Co. v. Anderson,* 17 B.R. 521 (Bkrtcy.S.D.Ohio 1982) (drapes) and *In re Hall,* 11 B.R. 3 (Bkrtcy.W.D.Mo.1980) (fence).

10. Zions also relies on *In re Miller,* 4 B.R. 392 (Bkrtcy.S.D.Calif.1980). In *Miller,* however, the only reason the court looked to retail or replacement cost to the debtor was that the parties stipulated that that was the proper measure of value. Thus, *Miller's* result does not represent a reasoned analysis.

the valuation to be performed under Sections 1325(a)(5)(B)(ii) is to measure the value of the collateral to the debtor, is not true.[11] Thus, although it is true that "the retention of the vehicle enables the debtors to avoid the necessity of replacement transportation," replacement cost is not the proper measure of value.

In view of the purpose of the valuation to be performed under Sections 1325(a)(5)(B)(ii), where the collateral is a car and the secured claimant does not present evidence on its usual commercially reasonable method of selling cars, courts have presumed that the value of the car is the wholesale value shown by industry used car guides. *See* cases cited, *supra*, note 7. Zions did not present such evidence in this case. Because Zions is not a car dealer, however, it is reasonable to presume, absent evidence to the contrary,[12] that Zions' usual method of selling cars is to dealers at wholesale. For this reason, the court finds the value of the car in this case to be $6,925.00, the wholesale/average trade-in value as of the date of the confirmation hearing.

This approach presupposes a purely hypothetical disposition of the collateral by the secured claimant. This concept is explained in detail by Collier, *supra*, at ¶ 506.04[2]. Obviously, in this case if Zions

actually had the car, the most commercially reasonable thing to do would be to exercise its rights under its recourse agreement with the dealer. Zions would in fact obtain the full unpaid contract price. That result, however, is not consistent with the purpose of Section 506(b). All but one of the cases which have considered the issue have so concluded. *In re Klein,* 20 B.R. 493 (Bkrtcy.N.D.Ill.1982); *In re Clements, supra; In re Van Nort, supra; In re Beranek, supra; In re Cooper, supra; In re Jones, supra.* Compare *In re Perskin,* 9 B.R. 626, 4 C.B.C.2d 294, 304 (Bkrtcy.N.D. Tex.1981). The lone case holding to the contrary is *In re Stumbo,* 7 B.R. 939 (Bkrtcy.D.Colo.1981). Collier explains the majority view:

> Although under the circumstances the holder of the secured claim is not restored fully to the position he would have occupied had he been able to foreclose upon the collateral, the majority view appears to be correct. The bankruptcy court must protect the holder of a secured claim only to the extent of the value of his interest in the estate's interest in the subject property. The court is not required to afford protection with respect to the creditor's contractual rights against third parties.

---

**11.** The court's references to going concern value add nothing to its analysis. Property is sometimes said to have a going concern value. This expression has at least two meanings. First, going concern value may refer to property which can be sold for a higher price as inventory of an ongoing business than if sold by a closed or closing business. This meaning is probably not the meaning intended by *Reynolds* because the car was not going to be sold and was not part of a business. Second, going concern value may mean that the debtor can use the property to generate income greater than the price for which the property could be sold. An example of this meaning could be tools used by a mechanic to produce income greater than the price which could be obtained at a sale in the used tool market. This meaning seems to be the meaning intended by *Reynolds.* Using this meaning when valuing a consumer's car, however, is artificial. It is not the use of the car that generates income for a Chapter 13 debtor who uses the car to drive to and from work. It

is the services of the debtor unrelated to the use of the car that generate income. Thus, to say that a car used to drive to and from work has a going concern value makes little sense. The thrust of *Reynolds* is that the debtor derives benefit in having the car because the debtor is not required to pay for substitute transportation. While this is true, it is nothing more than an argument for replacement cost as the measure of value.

**12.** The holding in this case does not preclude a secured creditor from presenting evidence on its ordinary, commercially reasonable method of selling cars. The court is aware that many banks and automobile financers sell repossessed cars not to dealers, but to private individuals or other persons. Thus, in a case where the creditor shows that it ordinarily sells cars to parties other than dealers, the court will fix an amount based on evidence showing the price obtainable at such a sale, less sales costs, such as advertising and commission.

Collier, *supra* at 506–31. Bowman and Thompson explain why *Stumbo* was wrong:

> At first blush, the *Stumbo* court's argument appears to be sound because it looks to the position of the creditor upon foreclosure and sale to determine the amount of its secured claim.... Section 1325(a)(5)(B) is meant to ensure that a secured creditor will receive the equivalent of recourse to the collateral which was the inducement for extending the loan to the debtor. In other words, section 1325(a)(5)(B) protects the creditor's expectations of recovery against the debtor in the event of default. As long as only the debtor and creditor are involved, these expectations are protected by guaranteeing the creditor the amount he would receive upon repossession and sale of the collateral.
>
> The existence of a repurchase agreement, however, alters the creditor's expectations. Though the creditor still only expects to recover the value of the collateral from the debtor, he anticipates additional recovery from the dealer in the amount by which the repurchase price exceeds the market value of the collateral in the creditor's hands. Thus, permitting the creditor to recover only the fair market value of the collateral in his hands *does* protect his expectations of recovery *as against the debtor.*
>
> Although the creditor's expectations of recovery against the dealer are admittedly thwarted, the creditor is clearly in the best position to protect his bargain with the dealer. The insertion of a provision that, upon the debtor's bankruptcy, the dealer is required to tender the repurchase price to the creditor and is subrogated to the rights of the creditor would protect the creditor's expectations of recovery against the dealer *at the expense of the dealer* —not at the expense of the debtor.

Bowman and Thompson, *supra*, at 576–577 (emphasis in original).

*Consequences of this Valuation.* The court confirmed this plan with a minimum

payment to Zions, as a secured claim of $6,975.00. This opinion finds that the allowed amount of Zions' secured claim should be $6,925.00. Thus, the order of confirmation must be modified accordingly.

Counsel for debtors shall submit an appropriate order.