In re Pamela W. MASTERSON, Debtor.

Bankruptcy No. 91–13907S.

United States Bankruptcy Court, E.D. Pennsylvania.

June 17, 1992.

Neil Leibman, Bala Cynwyd, Pa., for debtor.

Pamela A. Morone, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for Ethel Gardner.

Charles C. Coyne, Philadelphia, Pa., Interim Trustee.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

At issue is whether 11 U.S.C. § 706(a) of the Bankruptcy Code precludes the Debtor from converting a Chapter 7 case to Chapter 13 after that case had been previously converted from Chapter 11 to Chapter 7. This court follows the line of cases which hold that, although a debtor does not have an absolute right to a second conversion of a case from one Chapter to another, the court may exercise a discretional right to allow a second conversion. Based on the facts of this case, we exercise our discretion to allow this Debtor to convert this case to Chapter 13, subject to controls on future administration of this case.

### B. PROCEDURAL HISTORY

PAMELA W. MASTERSON ("the Debtor") filed a voluntary Chapter 11 bankruptcy petition, accompanied by Schedules, on July 18, 1991. The Schedules indicated that the Debtor had approximately $114,-000 in secured debts and $25,000 in unsecured debts. The secured debts were comprised of two mortgages on a single property the addresses of which are 1125–55 Stanwood Street and 1118–32R Solly Avenue in the Fox Chase section of Philadelphia, identified as a horse farm valued at $350,000 ("the Farm").

After a status hearing of November 20, 1991, as is held in all of our Chapter 11 cases, this court entered an Order of November 20, 1991, requiring the Debtor to file a plan and a proposed disclosure state-ment and notify all interested parties of the filing of the disclosure statement on or before March 2, 1992. That Order also tentatively scheduled a hearing on the disclosure statement on April 1, 1992, and stated that, if the Debtor failed to comply with the order, this case could be converted to Chapter 7 or dismissed by the court without a further hearing.

On December 16, 1991, the United States Trustee moved to convert the case from Chapter 11 to 7 on the ground that the Debtor had failed to file monthly operating reports, as required by Local Bankruptcy Rule 2015.1. A hearing on this motion was scheduled on January 29, 1992. On January 15, 1992, Ethel Gardner, the first mortgagee of the Farm, filed a statement in support of Trustee's motion, emphasizing that there was no evidence that the Debtor had maintained hazard insurance to protect Gardner's interest in the Farm.

The Debtor's counsel subsequently produced the overdue operating reports. At the hearing of January 29, 1992, where he appeared in response to the Trustee's motion, the Debtor was permitted an opportunity to produce proof of proper insurance for horse boarding and riding instruction at a continued hearing on March 4, 1992. However, when neither the Debtor nor her counsel appeared at the continued hearing, and upon our observing that a plan but no disclosure statement had been filed as of that date, we entered an Order, on March 4, 1992, converting this case to a Chapter 7 case.

On February 18, 1992, Gardner had filed a motion to lift the automatic stay to permit her to foreclose on her mortgage on the Farm. A hearing on this motion was scheduled on March 11, 1992, and initially continued by agreement until April 8, 1992.

On April 8, 1992, the Debtor filed a Motion to reconsider the order converting the case from Chapter 11 to Chapter 7. That hearing was scheduled on April 29, 1992, and Gardner agreed to continue the hearing on her Motion for relief until that date as well. At the April 29, 1992, hearing, counsel for Debtor requested a further con-

tinuance, asserting, for the first time, the Debtor's intention to file a motion to convert the case to Chapter 12 or Chapter 13 rather than to reconvert it to Chapter 11. By agreement of counsel, we entered an order, dated May 1, 1992, stating that any motion to convert the case to another chapter must be filed and served on or before May 15, 1992; that the hearing on any such motion would be continued for the last time on June 4, 1992; and that the hearing on Gardner's Motion would be continued to June 11, 1992.

In response, the Debtor, on May 15, 1992, filed the Motion to convert this case from Chapter 7 to Chapter 13 which is before us. A hearing was held on the instant Motion on June 4, 1992. Testimony was adduced from the Debtor only. Subsequent to this hearing, Gardner agreed to continue the hearing on her Motion for relief from the stay until July 2, 1992.

## C. FACTUAL HISTORY

The Debtor did not deny several relevant allegations in Gardner's Motion. These are that (1) the Debtor and her ex-husband purchased the Farm from Gardner, who now is 74 years of age and resides in Florida, on December 18, 1986; (2) on May 20, 1991, the Debtor bought out her ex-husband's interest in the Farm as part of a financial settlement in their divorce; and (3) since the Debtor took over the Farm, she has made but one mortgage payment to Gardner.

The remaining facts set forth are extracted from the Debtor's testimony. The Debtor has two mortgages on the Farm. She boards horses, and gives riding lessons to mostly children, at the Farm. When the Debtor first filed for bankruptcy under Chapter 11, she had not only just finalized her divorce and bought out her ex-husband's interest, but also she had recently lost her job with the United States Post Office ("the USPO") due to an injury. She stated that, although she would have preferred to continue to work, she was placed on disability status by the USPO.

The Debtor testified that, at the time of her divorce, the horse-boarding and riding-lesson business had dwindled. However, since filing her bankruptcy case and her becoming financially independent, the Debtor claimed that business had picked up substantially. She stated, in animated fashion, that she has now established her reputation as a skilled riding instructor with the parents of several Philadelphia police officers and has greatly increased her clientele among their children. She also emphasized the ideal facilities of the Farm, since it is located on the edge of Pennypack Park, which has horse trails, and it has an indoor arena in which she can conduct riding lessons in any type of weather.

The Debtor testified that her current exclusive sources of income are from horse boarders and riding students and their parents. She boards horses at approximately $220 per horse per month and charges $20 per hour for riding lessons. The Farm is capable of boarding a maximum of twenty-five (25) horses, but only five (5) are presently in residence. She claimed that the total of her monthly personal and business expenses, including her planned payments towards arrearages and the current mortgage payments, amounts to approximately $2600. She stated that she presently brings in approximately $2000 monthly from lessons ($1000) and boarders ($1000). She stated that she considers that her primary source of income is from the riding students because she uses the income from the boarders to offset her expenses for each month. Although the number of lessons she gives may fluctuate with the weather and seasons, she expressed confidence that, once a student starts, the facilities will allow the student to continue regardless of the weather.

The Debtor projects bringing in enough income to cover her expenses within "a couple of months." She also stated that she has, in hand, approximately $10,500 derived from a retirement fund from her employment at the USPO which can be drawn from immediately to be applied to her mortgage arrearages. She also testified that she expects to receive back pay from, or to get back her job at, the USPO.

However, if neither comes through, she claimed to be capable of working at other "desk-type jobs" and stated that she is currently in the process of submitting applications for such positions. Ultimately, she hopes to work and run the Farm at the same time. She has no children or other dependents. She stated that what she needs most is time to build her business.

On cross-examination the Debtor admitted that her present expenses exceed her income, but she stressed that her expenses are lower now than when she initially filed this case because most of the insurance that she was then paying is currently paid through the fall. However, she also admitted that her insurance expenses would arise again when the covered periods expired. Despite the imbalance of her expenses and income, she testified, with convincing enthusiasm, that she has a competitive "product" in a business that is both lucrative and untapped in Philadelphia.

## D. DISCUSSION

■ The initial issue at hand is whether the Debtor is prevented from converting a Chapter 7 case, previously converted from a Chapter 11 case, to a Chapter 13 case under the terms of 11 U.S.C. § 706(a), which reads as follows:

> The debtor may convert a case under this chapter to a case under Chapter 11, 12 or 13 of this title at any time, if the case has not been converted under section 1112, 1307, or 1208 of this title. Any waiver of the right to convert a case under this subsection is unenforceable.

The courts appear to be evenly divided on the issue of whether a "second conversion" of a case previously converted to Chapter 7 is *ever* permissible. Some courts have refused any second conversion. *See In re Carter*, 84 B.R. 744, 748 (D.Kan. 1988); *In re Vitti*, 132 B.R. 229, 231 (Bankr.D.Conn.1991); *In re Bryan*, 109 B.R. 534 (Bankr.D.D.C.1990); *In re Hanna*, 100 B.R. 591, 594 (Bankr.M.D.Fla. 1989); *In re Richardson*, 43 B.R. 636, 638 (Bankr.M.D.Fla.1984); and *In re Ghosh*, 38 B.R. 600, 603 (Bankr.E.D.N.Y.1984). Other courts have held that a second conversion

is possible, but have refused conversions in the exercise of their discretion on the facts before them. *See In re Somers Corp.*, 123 B.R. 35, 37 (Bankr.N.D.Ohio 1990); *In re Johnson*, 116 B.R. 224, 227 (Bankr.D.Idaho 1990); *In re Trevino*, 78 B.R. 29, 32 (Bankr.M.D.Pa.1987); and *In re Walker*, 77 B.R. 803, 805 (Bankr.D.Nev.1987). Finally, other courts, agreeing that a second conversion is possible, have exercised their discretion to *allow* conversion because the facts warranted it. *See In re Hollar*, 70 B.R. 337, 338 (Bankr.E.D.Tenn.1987); and *In re Sensibaugh*, 9 B.R. 45, 47 (Bankr. E.D.Va.1981).

The first line of cases reasons, through statutory interpretation, that, if a case has already been converted once, the debtor has no right to convert again. *Vitti, supra,* 132 B.R. at 230. *See also Carter, supra,* 84 B.R. at 747; *Bryan, supra,* 109 B.R. at 534; *Hanna, supra,* 100 B.R. at 593; *Richardson, supra,* 43 B.R. at 638; and *Ghosh, supra,* 38 B.R. at 603. These courts hold that the brief legislative history of § 706(a) supports such an interpretation. The *Carter* court stated that, in granting the debtors but one chance to convert, Congress "struck a balance between the competing policy of the debtor's opportunity to repay and the potential disadvantage of delay caused by repeated attempts to convert." 84 B.R. at 747.

However, we note that, although some case law supports this position, neither Gardner nor the United States Trustee, who appeared at the hearing on June 4, 1992, and opposed the conversion, argued that the debtors should be precluded entirely from a second conversion of a Chapter 7 case. Rather, these parties opposed the instant second conversion because they did not believe the Debtor would be capable of confirming a Chapter 13 plan.

This court, like apparently all of the interested parties, is most persuaded by the line of cases which interprets § 706(a) as allowing a second conversion, but only after a notice and hearing at which the Debtor's circumstances must be carefully scrutinized, instead of, as in the case of an initial conversion, being allowed to convert a

Chapter 7 case to another Chapter as of right. *See Trevino, supra,* 78 B.R. at 32; *Sensibaugh, supra,* 9 B.R. at 47; and *Hollar, supra,* 70 B.R. at 338. The reasoning of these cases is that § 706(a) precludes only a conversion as of right. The legislative history relied upon as supportive of this position is that which interprets the Code as a means of encouragement of debtors to repay their debts. These courts believe that the important issue to be determined, in the exercise of discretion as to whether to allow a second conversion, is whether the policy of encouraging a debtor to repay debts will be served by that particular conversion.

■ The Debtor presently has an income of approximately $2000 monthly from boarding horses and giving riding lessons. She was convincing in her testimony that her business could well be lucrative and is still untapped in Philadelphia and will generate enough income to cover all her expenses within a few months. Her business has been picking up since she first filed for bankruptcy and she expects the increase in activity to continue. It also cannot be forgotten that the Debtor has approximately $10,500 from a retirement fund into which she can tap immediately to cure much of her post-petition mortgage arrears. We accept her testimony that, with "a little more time," her business may well grow to a level sufficient to fund a Chapter 13 plan.

At bottom, the issue raised by Gardner and the United States Trustee is one of potential plan feasibility. Feasibility is one of the requirements, pursuant to 11 U.S.C. § 1325(a)(6), which must be satisfied to allow a Chapter 13 plan to be confirmed. However, in addressing the feasibility requirement in the context of a Chapter 13 case in *In re Capodanno,* 94 B.R. 62, 65 (Bankr.E.D.Pa.1988), this court stated as follows:

> [most] recent cases recognize that § 1325(a)(6) only requires that the Debtors' budget appears realistic and that the "expectations of income are sufficiently realistic that they should be given an opportunity to carry out the plan they propose." *In re Compton,* 88 B.R. 166,

167 (Bankr.S.D.Ohio 1988). *See also In re Frey,* 34 B.R. 607, 608–09 (Bankr. M.D.Pa.1983); *In re Anderson,* 18 B.R. 763, 765 (Bankr.S.D.Ohio 1982); and *In re Perskin,* 9 B.R. 626, 632–33 (Bankr. N.D.Tex.1981).

Our own decisions have acknowledged the economic resiliency of low-income persons, who are often accustomed, by necessity, to get by on financial arrangements which persons blessed with higher incomes find inconceivable. *See In re Crompton,* 73 B.R. 800, 809 (Bankr. E.D.Pa.1987) (in considering financial prospects of unmarried female debtor with two young children, this court refuses to set down a rule that a "cushion" is always a prerequisite). We fail to see where we are giving any favors to persons in dire financial straits by declining to give them a chance to preserve their homes, thereby pushing them closer to or into the growing ranks of the homeless. Therefore, we are inclined to give debtors a chance, even when their post-payment performances have been "abysmal," as long as their plan "does not seem to us to be out of reach." *In re Mitchell,* 75 B.R. 593, 599, 600 (Bankr. E.D.Pa.1987). If they fail to maintain their payments under the Plan, the Standing Chapter 13 Trustee, as well as any interested party, may move for dismissal or conversion of the case to Chapter 7. 11 U.S.C. § 1307(c)(6).

.    .    .    .    .

Collier, though emphasizing the importance of the feasibility requirement, agrees with our approach. That text counsels that "[e]ven when the court has serious doubts about feasibility, the debtor should usually be given a chance to attempt their [sic] proposed plan [and] ... the court should be reluctant to impose its idea of what sacrifices the debtor is able to make." 5 COLLIER [ON BANKRUPTCY], ... ¶ 1325.07, at 1325–45 [ (15th ed. 1988) ]. We therefore approach ... analysis of the Debtors' economic status, in reference to § 1325(a)(6), with the spirit of giving the Debtors the benefit of any doubt.

*Cf. In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 410 (Bankr.E.D.Pa.1991) (feasibility requirement of 11 U.S.C. § 1129(a)(11) is not a difficult threshold to clear).

It may be that the Debtor's "lost year" in Chapter 11 and Chapter 7 could restrict her ability to reorganize somewhat, since it might be argued that she now will have only about 48 months of plan period left to liquidate her mortgage arrearages. *See In re Cobb,* 122 B.R. 22, 26–27 (Bankr.E.D.Pa. 1990). However, it is apparent that this case should be considered as a "new" case, with the 60–month maximum plan period measured from the date of conversion. *See* 11 U.S.C. § 348(b). And it is not inconceivable that the Debtor could propose a feasible plan even with a 48–month maximum-plan-period handicap.

The Debtor is in the early stages of establishing her business. She wishes to convert her case to Chapter 13 to obtain the opportunity to gain steady footing and a chance to pay her debts. Her situation is therefore different from those of the debtors in *Johnson* and *Trevino,* where the courts denied reconversions to Chapter 13 and Chapter 11, respectively, because neither debtor showed that creditors were likely to benefit from the reconversions. In *Johnson, supra,* 116 B.R. at 227, the court denied a reconversion to Chapter 13 because debtor did not show that the reconversion would be likely to be successful. In *Trevino, supra,* 78 B.R. at 32, the court denied reconversion because it found that the debtor already had had a sufficient opportunity to repay debts, had not done so, and was not likely to do so upon return to Chapter 11. The instant Debtor, by way of contrast, has established "cause" for reconversion by demonstrating that the only way she can maintain her business and pay her creditors is to keep the Farm and generate enough income from it to pay off her debts. Without the Farm, the Debtor's prospects for her achievement of that goal would be greatly diminished. Her "failures" in Chapter 11 appear to have resulted from the ill-advised choice of that Chapter in the first place.

Also, this case is readily distinguishable from *Walker, supra,* 77 B.R. at 805, where the court found that the debtor could not meet the debt-limitations requirements of 11 U.S.C. § 109(e), and that therefore conversion of that debtor's case to Chapter 13 would be futile. The Debtor's debts do not exceed the maximums ($350,000 secured debt and $100,000 unsecured debt) set forth in 11 U.S.C. § 109(e). She has only about $114,000 in secured debts and $25,000 in unsecured debts.

We must also add that we have little doubt that the Debtor satisfied the further requirement of 11 U.S.C. § 109(e) that she must have "regular income." The Code, at 11 U.S.C. § 101(29), defines an individual with "regular income" as

> [an] individual whose income is sufficiently stable and regular to enable such individual to make payments under a plan under chapter 13 of this title, other than a stockbroker or a commodity broker.

The Debtor testified that she presently has an earned income of $2000 a month and projects that it will increase to meet her expenses within a few months. *Compare In re Rowe,* 110 B.R. 712, 717–18 (Bankr. E.D.Pa.1990) (receipt of regular gratuitous payments to debtor from her son suffices); and *In re Zawisza,* 73 B.R. 929, 934–35 (Bankr.E.D.Pa.1987) (public benefits are "regular income"). For the reasons given, the Debtor has fulfilled the Chapter 13 requirements and is eligible to file under that Chapter.

We thus perceive no impediment to the conversion of the Debtor's case to Chapter 13 at this time. Consequently, as in *Hollar, supra,* we will allow the Debtor to convert her instant case from Chapter 7 to Chapter 13 even though this case was previously converted from Chapter 11 to Chapter 7. However, because of the Debtor's "lost year" renders time of the essence to her success, our Order granting the instant Motion will also include deadlines by which the Debtor must achieve the important benchmarks in her (now) Chapter 13 case.

**90**

### E. CONCLUSION

An appropriate Order consistent with this Opinion will be entered.