In the Matter of Jesse J. COOPER, Jr., Judith E. Cooper, Debtors.

**CHRYSLER CREDIT CORPORATION,**
Plaintiff,

v.

Jesse J. COOPER, Jr., Judith E. Cooper, Defendants.

**Bankruptcy No. 80–01472A.**

United States Bankruptcy Court, N. D. Georgia.

Sept. 16, 1980.

**538**

Edward A. Pilkington, Decatur, Ga., for plaintiff.

John E. Sacker, Jr., Atlanta, Ga., for defendants.

## OPINION

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

On April 15, 1980, debtors filed a petition for relief under Chapter 13 of the Bankruptcy Code. The plan filed by the debtors proposed to pay over a period of three years 100% of all allowed secured claims, including a secured claim of Chrysler Credit Corporation, the security for which was a 1978 Chrysler Cordoba automobile. The total amount owing on said vehicle at the time the debtors filed their petition was $6,283.90, principal and interest. The debtors contend that Chrysler Credit is entitled to an allowed secured claim to the extent of the market value of the Cordoba based on the valuation of the collateral as shown by the National Automobile Dealers Association (NADA) used car appraisal book, which is $3,100.00.

The plaintiff filed an objection to confirmation via an adversary proceeding alleging that the true value of the automobile is $4,569.97. This alleged value is based upon the fact that Kelly Chrysler Plymouth, the dealer that sold the car to the debtor, is obligated pursuant to an agreement with Chrysler Credit Corporation to purchase the automobile from Chrysler Credit for the amount of principal then owing at default, to wit: $4,569.97. Under the recourse loans of Chrysler Credit, the dealer who sold the vehicle given by the purchaser-borrower as security under the loan agreement is obligated, upon default of the borrower, to purchase the loan agreement by paying Chrysler Credit the amount of the existing debt less unearned interest and charges. Chrysler Credit argues that, because it will receive $4,569.97 from the dealer under the recourse loan agreement, that $4,569.97 amount is the *value* of its allowable secured claim.

## CONCLUSIONS OF LAW

(1) *The allowed amount of the claim*: The amount of an allowed secured claim is determined in accordance with the provisions of 11 U.S.C. § 506(a) and (b).

Section 506(a) states, in part:

"An allowed secured claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim *to the extent of the value of the creditor's interest in the estate's interest* in such property....

Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." [Emphasis supplied]

The comment by the House Judiciary Committee relevant to § 506(a) reads in part as follows:

"Subsection (a) of this section ... 'Value' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the case...." H.R.Rep.No.595, 95th Cong., 1st Sess. p. 356 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5963, 6312.

And the Senate Judiciary Committee, concerning its version of § 506(a), which

was enacted as part of amended HR 8200, states in part:

"... While Courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the property...." S.Report No.989, 95th Cong., 2d Sess. 68, (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5854.

In support of its argument that $4,569.97 is the value of the vehicle, and thus the amount of its allowable secured claim, Chrysler Credit cites the decisions of *In re Robert Harden Adams and Carol Hall Adams*, (Bkrtcy.M.D.Florida, 1980) 2 B.R. 313, 1 CBC 417, 5 BCD 1234, and *In re Crockett* (Bkrtcy.N.D.Ill., 1980) 3 B.R. 365, 1 CBC 2d 926, 6 BCD 226. In these cases the court held that the secured creditor was entitled to the wholesale value of the vehicle, for purposes of valuation, rather than the retail value. The Court in the *Adams* case stated that

"... The credit union is not an automobile dealer, *and the collateral's value to them is only what they could get for it by their customary means of disposition,* in this case, sale of the car at wholesale to an automobile dealer...." [Emphasis supplied] 2 B.R. 313, 5 BCD at 1235.

Thus, under this reasoning, the value under Section 506(a) is the market value, as determined by what amount the creditor can obtain in a customary sale to available customers in its ordinary marketing method of offering the vehicle for sale.[1]

Chrysler argues that its *Policy of Full Repurchase* with its dealers, and the Full Repurchase provisions in its contract (Exhibit to Proof of Claim) establishes what Chrysler Credit can get for the vehicle *now*, and further establishes Chrysler Credit's customary means of disposition of vehicles.

In the *Adams* case the court set the fair market value at an amount that a ready, willing and prompt purchaser, without advertising and marketing expenses by the seller, to wit, a retail dealer, would pay for the automobile for resale. Apparently, that was the only reasonably available market for the creditor. The creditor was not equipped and organized to store, protect, advertise and sell the vehicle in the retail market. Additionally, such marketing expenses would reduce its net return from the proceeds of a retail sale to a consumer. Hence, the quick sale to a retail auto dealer was its best way to achieve market value of its "interest in the estate's interest." Such sale was a transaction in which the sale's price would be dictated by the age, general condition, public demand and subsequent retail marketability of the automobile—factors which determine value in the marketplace. For most lenders, as in the *Adams* case, the most reasonable, efficient and economical market seems to be a wholesale sale to a retail used automobile dealer. This is also the market most likely available to this estate, i. e.: without storage, advertising and selling costs.

In the case at bar the price at which a Chrysler dealer would be required (by a contract existing from time of original sale) to repurchase the automobile from Chrysler Credit reflects no true indicia of market value. The testimony of Chrysler Credit representatives is that its with-recourse guaranty or surety agreement with the dealer, whereby the dealer must repurchase the vehicle under a predetermined contractual formula, has no relation to the age, general condition, public demand and retail marketability of the vehicle. The witness for Chrysler Credit admitted that if the automobile dealers were free to bargain with Chrysler Credit that the repurchase price would be much less than that the $4,569.97 contended here by Chrysler Credit to be the value. It is the freedom to bargain which establishes a value, as the term is used in § 506(a). The term "value" as used in § 506(a) to determine the "creditor's interest in the estate's interest" contem-

---

1. Thus, an automobile dealer, as a creditor, might establish higher value for an automobile via a sale to a customer at retail than might a financial institution which has no retail means of marketing vehicles.

plates current fair market value of the particular collateral. Such value is determined in the marketplace normally applicable to that particular type of property in which the estate has an interest and on which the creditor has a lien. The Section 506(a) value of such property cannot be determined by some pre-arranged standard or basis in an agreement between the claimant and its guarantor or insuror which has nothing to do with what the value in a free market where values of such types of property [2] are customarily determined.

■ Chrysler Credit's "interest in the estate's interest" in such property is the "proposed disposition or use of such property" by the dealer, which § 506(a) says has a bearing on the valuation. The use of the property by the dealer is to sell the vehicle at retail to a consumer. The evidence demonstrates that the value to the dealer (and to the estate) is less than the contract purchase price from Chrysler Credit. The Chrysler Credit contract value is an artificial and fictional value having no relation to disposition or proposed use of the property. A claimant under Section 506(a) may not be allowed a claim in an amount greater than the market value of the collateral as determined in relation to the proposed actual use of such property by the creditor or debtor.

The evidence shows that the NADA used car valuation book reported value of this vehicle is $3,100.00. This is an indication of the value established throughout the southeastern states region by automobile dealers given the freedom to bargain over sales price. The automobile dealers periodically furnish information to NADA showing the amount of each sale of its used cars to retail consumers. These reports by member dealers are consolidated into averages by NADA for its publication.

This market value of $3,100.00 is verified by the weekly "Black Book" quotations issued for the week of the hearing on valuation by the National Auto Research Corporation, Gainesville, Georgia 30501, for the State of Georgia. The Black Book publishes the average of the sales in several weekly regular auctions of the various vehicles classified by year, models and condition. Auto dealers are the only permitted purchasers. This publication reflects only actual public sales at auction, and is perhaps the truest and most accurate reflection of wholesale market value in each state or region.

Such market reports are used by auto dealers and financial institutions and individuals not regularly engaged in the retail sale of vehicles to determine market value.

Therefore, the value of the Chrysler Cordoba automobile at the time of filing this claim and the confirmation hearing is found to be $3,100.00. The amount of the allowed secured claim is $3,100.00.

(2) *The value to be paid under the plan* : With respect to each allowed secured claim, Section 1325(a)(5)(B)(ii) of Chapter 13 of the Bankruptcy Code provides that the value to be distributed under the plan to the claimant (i. e.: over the duration of the payment of the allowed claim) shall be not less than the value of the claim as of the date of confirmation. A payment of $3,100.00 *now* to the claimant, of course, would satisfy said Code provision. And, surrender of the collateral to the secured claimant would satisfy the provision. Either method executed *now* would pay the allowed secured claim in full.[3] But, neither is proposed by debtor's plan. The plan proposes to pay the principal of $3,100.00 over a period of three years, plus interest of 10% per annum in equal monthly installments. Debtor's counsel admits this 10% rate is arbitrarily determined but insists it is reasonable for the payment of this amount over this time frame and cites *In re Lum* [4] in support of said rate. No interest rate is listed on the loan contract in the instant case, but the finance charge resulted in the

---

2. See Georgia Code Section 109A–2–724 re use of market quotations in valuation.

3. See House Report 95–595, 95th Cong., 1st Sess., § 1325, p. 430.

4. *In re Lum*, 1 B.R. 186, 5 BCD 1039, 1040 (Bkrtcy. ED Tenn.1979).

disclosure of an annual percentage rate of 19.30%. The claimant argues that this contractual annual percentage rate of 19.30% should be applied to its allowed secured claim rather than the 10% rate provided in the plan of the debtor. Neither plaintiff nor defendant offers evidence, authority or argument for such conclusions.

Section 1325(a)(5) offers a privilege similar to that granted to Chapter 7 debtors under Section 722 which allows the debtor, by making a cash payment to the lien claimant in the amount of the value of the collateral, to redeem and retain the collateral in which the lien claimant has a security interest and prevent recovery of the collateral by the claimant.

But, said Chapter 13 provision may be more advantageous to debtors than the Section 722, Chapter 7 redemption provision. That is, the Chapter 7 debtor may not be able to take advantage of the redemption provision because he must pay cash in full contemporaneously with the determination of value and allowance of redemption by the court and the debtor may not be able to raise the funds to refinance the value of the property sought to be retained. *In re Stewart*, 3 B.R. 24, —— BCD —— (N.D.Ohio 1980); *In re Miller*, 6 BCD 346 (E.D.Mich. 1980). Section 1325(a)(5), on the other hand, allows the property to be retained by the Chapter 13 debtor if the value of the proposed deferred payments equals the present value of the security. This differs from Chapter 7 redemption procedure where the value is required to be paid in cash forthwith at redemption, in that the Chapter 13 provision allows the value of the security to be paid over a period of time. This Chapter 13 provision also differs from the reaffirmation of a discharged debt which is permitted under Section 524(c) at the Section 524(d) post-discharge/reaffirmation hearing. The procedure for obtaining court approval of the reaffirmation of

all or part of a discharged debt to be paid in installments as allowed under Section 524(c) requires a pre-determined, executed *voluntary* agreement between the debtor and the secured claimant, while the Section 1325(a)(5) procedure allows an *involuntary* installment payment arrangement as approved by the court.

Under Section 524(c) it is the responsibility of the Bankruptcy Judge to hear the evidence from the debtor in support of the application[5] for approval of the previously negotiated and executed[6] debt agreement and make a determination whether (1) the economic burden flowing from the terms of the debt agreement in comparison to the value of the collateral to be retained by the debtor and the need of the debtor and family for the use of said collateral is in the best interest of the debtor and (2) is *not* an "undue burden" upon the debtor and debtor's family. The amount of the periodic payments and the term must be reasonable in comparison with the debtor's current budget and the value of the collateral should exceed or be close to the amount of the principal of the debt so that in the event of loss of employment or unusual adversity which might befall the debtor in the near future, there would be little likelihood of a substantial deficiency to the creditor in the event the debtor was unable to continue the payments. This court considers the value of the collateral and the reasons for the reaffirmation in comparison to the debt principal and total debt and the periodic payments schedule, not the rate of interest which is included in the total extended debt. It is the total debt, periodic payments, extent of the term and the value of collateral which bears on the Section 524(c)(4)(A) best interest of debtor and undue hardship standards.

■ The responsibility of the court is to assure fair treatment of the secured creditor and the debtor under Section 1325(a)(5)

---

5. It is an "Application" procedure which accompanies the executed agreement, as provided in Bankruptcy Rule 901(4), rather than a motion under Rule 901(9), because the debt agreement has approval decision by the court after hearing evidence of the debtor as to undue hardship and best interest. See also suggested Interim Rule 4004.

6. 11 U.S.C. 524(c)(1), (4) and (d).

by requiring a correct valuation of the collateral, and to make a correct determination of the value of that amount to be paid over the approved time payment period. That value and adequate value protection is what the claimant must be assured throughout the pendency of the Chapter 13 case. The concept of adequate protection for the secured claimant as required by Section 363(e) seems inherent in Section 1325(a)(5). That adequate protection which is demanded is that the value of the security at any point during the payment period shall not be less than the principal amount of the allowed claim. Thus, the monthly payments on the principal of the allowed claim determined by the court shall be no less than the monthly depreciation of the value of the security found at the confirmation hearing. If the depreciation rate of the collateral closely following the confirmation hearing is greater than later when the property is older, the early payments on reduction of the principal of the allowed claim must be greater than the later payments. If the debtor is unable to make such payments, Section 1325(a)(5) is not satisfied and the plan should not be confirmed. That is, the early depreciation in value should not be allowed to exceed the early payments. Also, market circumstances may occur which suddenly reduce the value of the collateral. After a value has been established at confirmation of the plan the secured creditor is not expected to assume a hazardous position in which the debt owed him is not retired equally as fast as his secured value declines. Should such a situation arise, upon the filing of an adversary proceeding under Section 362(d) and a prompt hearing, the claimant must be allowed to recover the security.

In order to distribute to Chrysler Credit over the succeeding three year period after confirmation an amount equal to the full value of the allowed claim as required by § 1325(a)(5)(B)(ii), it has been suggested that "incremental adjustments" in the form of interest should be added to the principal of the claim.[7]

But how is this interest factor or cost for use of money, which may be appropriate for this period, to be determined?

What is the value today to this secured claimant of $3,100.00 deferred and distributed in equal installments over the three years of 1980–83?

This court agrees that the purpose of charging an interest factor on the allowed secured claim in such cases is not to generate profit for the creditor, but "to protect the secured creditor from loss caused by the allowed secured claim being paid over a period of time."[8] The annual interest factor allowed by the court In re Lum, supra, there was 10%. It is not clear how that rate of 10% was determined for the use of money over that period of time. Perhaps it was the maximum allowed by the state usury laws.

 Such rate of cost for use of money is less than that currently charged to the most credit worthy borrowers in this country. But surely the debtors in Chapter 13 cases are not entitled to pay a rate for use of money which is less than the range of the prime rate of 13½%—15½% currently[9] charged by United States lending institutions to the most superior credit risks, presumably such as General Motors, AT&T, DuPont, the most sound public utilities and the like. The Georgia Motor Vehicle Sales

---

7. *In re Lum, supra*; 11 U.S.C. Section 1325(a)(5)(B)(ii), which requires such additional payments to compensate for the deferred payment of the value of the allowed claim, is unlike Section 1322(b)(2) which prohibits the modification of the loan agreement on the debtor's principal residence; thus, the payments of the defaults allowed under § 1322(b)(5), to be made within a reasonable time, may not be greater than those additions and charges specified in the loan agreement in event of default.

8. *In re Lum, supra*.

9. The range of the prime rate announced by the largest banks during the weeks elapsing in the preparation of this opinion. But cf., *In re Leigler*, 1 CBC 2d 874, ——— BCD ——- (S.D.Ohio 1980) which used the fixed rate of I.R.S. under Section 622, which is based on the prime rate.

Finance Act [10] and Georgia Industrial Loan Act [11] allow charges and interest (i. e., for the use of money) to lenders similar to the plaintiff in this case which produces Annual Percentage Rates in accounts similar to and exceeding the 19.30% herein contended by plaintiff as being appropriate in this case.

This court is not satisfied with the unsubstantiated arguments of the debtor or the recent court precedents suggesting the prior mentioned deferred payment charges. The court has no basis, no evidence on which to determine a proper percentage charge for the use of this $3,100.00 over the next three years. Surely, the proper charges for the use of money which the Chapter 13 claimant is entitled under Section 1325(a)(5) is no less than what the claimant in these inflationary times normally and currently receives for similar funds it lends. The seriously financially distressed Chapter 13 debtor may be less credit worthy, a greater risk, than the normal customer of this type lender. It seems reasonable to assume that the APR rate received by Chrysler Credit would be somewhat greater than the prime rate because it seems unlikely that Chrysler Credit currently borrows its funds or obtains its equity capital to make loans (similar to this involuntary loan of $3,100 for a period of three years) at a rate less than the prime rate of interest. Chrysler Credit would be expected to mark up an expected profit on the rate of interest it pays as a borrower into the rate of interest it charges to consumer borrowers. In any event, this court concludes that the deferred payment rate of "incremental adjustments" or the interest factor which should be allowed to the Chapter 13 secured claimant in addition to the principal amount of the allowed claim must be adequate compensation for use of that principal amount over the period of the plan, and must take into consideration the cost of replacement of funds, and anticipated inflation.

Therefore, the court requests briefs of arguments and authority in the form of affidavits or other evidence and citation of law from the debtor, the claimant, and any other parties of interest in the issue under discussion. These briefs should deal specifically with the interest or incremental adjustment rate should be allowed under § 1325(a)(5)(B)(ii) for the deferred payment of the principal amount of this allowed secured claim and the monthly payments which are necessary to provide to this claimant the adequate protection required under § 1325(a)(5)(B)(ii); during the future 36 months for the use of the claimant's $3,100.00.

January 27, 1981 @ 2:00 p. m. is the date of a hearing to be held in room 546, U.S. Court of Appeals Courthouse, Atlanta, Georgia to allow presentation of any additional evidence relevant to the issue.

---

**10.** Ga.Code Ann. § 96–1004.

**11.** Ga.Code Ann. § 25-315.