**In re Mark Anthony BYINGTON and Bonnie Kay Byington, Debtors.**

**Bankruptcy No. 96–10370.**

United States Bankruptcy Court,
D. Kansas.

June 20, 1996.

Eric D. Bruce, Wichita, KS, for Associates Commercial Corporation.

Martin R. Ufford, Wichita, KS, for Debtors.

Royce E. Wallace, Chapter 13 Trustee, Wichita, KS.

## ORDER CONFIRMING CHAPTER 13 PLAN

JOHN K. PEARSON, Bankruptcy Judge.

This case is before the Court for confirmation of the debtors' plan. At issue is the valuation of the debtors' semi-tractor under 11 U.S.C. § 506(a). The debtors, Mark Anthony Byington and Bonnie Kay Byington, appear in person and through their counsel, Martin R. Ufford, Wichita, Kansas. The creditor, Associates Commercial Corporation (hereinafter "ACC"), appears through its counsel, Eric D. Bruce, of Bruce, Bruce & Holt, L.L.C., Wichita, Kansas.

## JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

## NATURE OF CASE

While ostensibly a battle over confirmation of the debtors' Chapter 13 plan, the true issue here is the standard to be used in determining the value of the debtors' semi-tractor. The parties frame the issue as whether the tractor should be valued based on a wholesale or retail standard in determining whether the plan may be confirmed under 11 U.S.C. § 1325(a)(5)(B). The Court must first determine, as a matter of law, the correct valuation standard, and then find, as a matter of fact, the value of the vehicle. If the debtors' plan provides to pay an appropriate value,[1] the plan may be confirmed. ACC argues the retail value is the correct valuation standard. Debtors assert the wholesale value is the correct valuation standard. For the reasons discussed below, the court agrees with the debtors that the appropriate standard for valuing collateral in confirmation situations is the "wholesale" value.

## FACTS

Debtor executed a note and security agreement on August 17, 1995 in conjunction with the purchase of the used 1992 Freightliner tractor at issue here. Tractors of this nature are used to transport trailers across the country. The debtor has been a truck driver for approximately 18 years and, at the time of trial, was operating as a contract hauler. After buying the used tractor in August of 1995 for $52,000, he encountered financial difficulties and filed this Chapter 13 case on February 9, 1996.

Expert testimony was presented at the evidentiary hearing by both parties on the issue of the valuation of the tractor. Debtors' expert, Kent Jamesby, is employed as a tractor salesman at Kansas Truck Center, an authorized dealer of Freightliner tractors in Wichita, Kansas. He has two years of experience in selling and appraising tractors at

---

1. Not at issue are the monthly payment, repayment period or interest rate provided in the plan.

wholesale and retail. Debtor has taken vehicles to Kansas Truck Center for service.

ACC's expert, Tom Morris, is an independent insurance adjuster with 39 years of experience working on, insuring, adjusting and selling tractors. He has bought and sold totaled tractors for ACC for the past eight years. As an insurance adjuster he appraises the retail value of a tractor then appraises the damage and determines whether to repair or replace the tractor.

Debtors' expert inspected the interior and exterior of the cab, engine, tires, wheels, glass and other mechanical and structural components of the tractor to determine its value. The debtor informed the expert of an engine knock and started the engine for his observation. His written appraisal was admitted as an exhibit. The appraisal noted damage to the cab exterior and a knocking noise in the engine and estimated the cost to replace the damaged parts to be around $300.00. Although the debtors' expert heard the noise and believed it to be an exhaust leak, this did not factor into his appraisal.

Based on his inspection of the tractor, Debtors' expert estimated a retail value between $22,000-$24,000, varying with the cost of clean up and repair prior to sale, and a wholesale value of $20,000. The retail value is based on what a similar tractor in similar condition would bring in Wichita. Debtors' expert testified a similar tractor in Omaha may sell for significantly more than in Wichita. In 1992, when the tractor was new, it may have originally sold for $75,000-$78,000. These vehicles depreciate approximately 20–25% in the first year and 20% per year over the next three years.

ACC's expert examined the tractor and took photographs of the tractor and damage to the exterior cab and an oil leak in the engine. He prepared a tractor inspection report. Both were admitted as exhibits. This report does not have places to indicate body damage, major or minor repairs to the engine, major repairs to the transmission, repairs to axles or whether the frame is bent or broken. The expert's letter to ACC's

attorney indicates old damage to the exterior cab in five places, scratches in the paint and a leak in the engine front crankshaft. He testified he did not hear a knock in the engine. He also testified the damage to the cab is not as "bad", as Debtors' expert indicated.

ACC's expert estimated the retail value of the tractor at $36,062 and a wholesale value between $31,000-$33,000. The wholesale value is usually 10–20% lower than retail. He testified the retail price is the amount an average customer would pay for the tractor for his or her own use. He telephoned a number of dealers in the Kansas City area and one in the Wichita area and asked them what they would sell the tractor for at retail. He averaged the highest ($40,000) and the lowest ($32,000) retail figures. He also looked at the National Automobile Dealers Association ("NADA") guide, which contains retail and wholesale values for new and used vehicles. ACC's expert stated that NADA values are generally higher than what the tractor would actually sell for. The expert also looked in a national and local trade magazine for the list price of similar tractors. The expert based his appraisal on the Kansas City area because the tractor was purchased just outside of Kansas City. In his report, he suggested the use of the lower "dealer average ACV" amount over the NADA amount because it is "of this area".[2] (See Pl's. Ex. 4).

The debtor testified that in his opinion the wholesale value of the tractor is $25,000.

### FINDING OF FACT

The court makes the following finding of fact:

1. For the reasons discussed below, the Court finds that the wholesale value of the tractor is $25,000.

### CONCLUSIONS OF LAW

1. The Court must use a wholesale value standard in valuing vehicles[3] for confirma-

---

2. Just what that means is unclear to the Court.

3. The same standard would apply in valuing equipment and manufactured housing. A different standard might apply to valuing household

tion purposes as that standard most closely reflects the result a creditor would obtain if it were to recover its collateral and liquidate it.

2. The plan may be confirmed.

## DISCUSSION

■ Superficially, the issue here is simply the value of the semi-tractor, which the debtors propose to pay for through their plan. The real issue is the standard by which that value is measured. Under Chapter 13, a debtor can retain property of the estate by paying a secured creditor the value of the collateral. 11 U.S.C. §§ 1322(b)(2), 1325(a)(5). Where the value of the collateral is less than the debt, the debtor may 'strip down' the creditor's secured claim to the value of the collateral.[4] The balance of the claim over and above the value of the collateral is unsecured and treated as such in the plan. In this case, as in many, the unsecured creditors will receive little on account of their claims.[5] 11 U.S.C. § 506.

The standard selected for measuring the 'market' value of collateral has a major impact in virtually every reorganization under Chapter 11, 12 or 13 where the debtor seeks to retain and use property subject to a security interest.[6] The issue is hardly academic: selecting a value standard which results in high values will mean many debtors will be either unable to retain necessary collateral or will have no surplus to pay unsecured credi-

tors; selecting too low a standard will arguably dry up consumer and small business credit.

The Court is using the term 'standard' in this discussion to refer to the benchmarks or reference points used to determine the value. "Fair market value" is defined as "the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *In re Johnson*, 165 B.R. 524, 529 (S.D.Ga.1994) (quoting BLACK'S LAW DICTIONARY 597 (6th ed. 1990)). To a certain extent, market value is a misnomer in this context since neither the creditor nor the debtor is a willing participant in an actual sale of the collateral. None the less, the courts generally look to a market value standard in plan confirmation[7]. *See* 3 COLLIER ON BANKRUPTCY ¶ 506.04[2] (15th ed. 1996). There are at least two standards for assessing market value—representing two different types of market: i) wholesale, generally defined as what the creditor would receive if it sent the recovered collateral to an auction or sold to a dealer who in turn sells it to the public, and ii) retail, generally defined as the sale by a merchant engaged in selling goods of that type to the public or the replacement cost to the debtor. *See In re Trimble*, 50 F.3d 530, 531 (8th Cir.1995). *See also In re Penick*, 170 B.R. 914, 918 (Bankr.W.D.Mich.1994) ("Wholesale

goods, jewelry and some tools of trade if a creditor could show that it would actually resell such collateral at a price closer to the retail price.

4. Although often an issue in cases of this type, the discount or interest rate on the payments to be made through the plan is not disputed here. The debtor must pay the current market value with an interest rate over the life of the plan.

5. Unsecured creditors have filed claims totaling $23,910.35. Unsecured creditors will receive a portion of the debtor's net income after secured claims are satisfied. A higher value placed on the vehicle will mean a lower payment to unsecureds as it will take longer for the secured creditor to be paid. Based on a wholesale value of $25,000, the unsecured creditors will receive approximately 5.4% of their claims, if all claims are allowed as filed.

6. To a lesser extent, the valuation standard has an impact in liquidation cases under chapter 7

where debtors attempt to retain and redeem exempt property under 11 U.S.C. § 722 and a value of the redeemed collateral must be determined by the court where the parties are unable to agree.

7. The market standard as applied to personal property with recognized market guides does not apply to going concern valuation of businesses, *see, e.g., In re Cellular Information Systems*, 171 B.R. 926, 930 (Bankr.S.D.N.Y.1994) (applying going concern value to cellular telephone service business in Chapter 11 case); *In re Matthews*, 75 B.R. 379 (Bankr.E.D.Mo.1987) (applying going concern valuation of liquor store equipment, inventory, and proceeds in Chapter 11 case); or the foreclosure valuation of real estate. *See, e.g., In re Robbins*, 119 B.R. 1, 5 (Bankr.D.Mass.1990) (applying foreclosure valuation to real estate in Chapter 11 case).

market value represents the amount that a particular item, in its present condition, would currently sell at the wholesale level. Wholesale is distinguished from retail in that overhead and sales commissions are removed.") (citing *In re McQuinn*, 6 B.R. 899 (Bankr.D.Neb.1980)); *In re Redding*, 34 B.R. 971, 973 (Bankr.M.D.Pa.1983) (wholesale value is "retail value less commissions, selling costs and profits.") (citing *In re McQuinn*, 6 B.R. 899 (Bankr.D.Neb.1980)); *In re Cooper*, 7 B.R. 537, 539 (Bankr.N.D.Ga.1980) (Wholesale value is "that amount that a ready, willing and prompt purchaser, without advertising and marketing expenses by the seller, to wit, a retail dealer, would pay for the automobile for resale."). While there are other formulations of the standard, they generally involve a figure somewhere between wholesale and retail or average the two in some way.[8]

▇▇▇ Selecting the standard for assessing the value is only half the process: the Court must measure the evidence of value against the standard and determine the value. The interpretation of § 506(a) and the appropriate method of valuation is a question of law, while the determination of the value of the collateral is a question of fact. *See In re Clark Pipe and Supply Co.*, 893 F.2d 693, 697–98 (5th Cir.1990).

The departure point in determining whether a plan may be confirmed under § 1325(a)(5)(B) is § 506(a), which provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the *value of such creditor's interest* in the estate's interest in such property ... and is an unsecured claim to the extent that the *value of such creditor's interest* ... is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property*, and in conjunction with any hearing on such disposition or use or on a plan

affecting such creditor's interest. (emphasis added).

The statute is ambiguous in that it does not refer to any particular standard or market type for determining the *'value of such creditor's interest.'* The legislative history provides little guidance. The Senate Report states that "[w]hile courts will have to determine value on a case-by-case basis, the subsection makes it clear that valuation is to be determined in light of the purpose of the valuation and the proposed disposition or use of the subject property." S.Rep. No. 989, 95th Cong., 2d Sess. 68 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5845. Similarly, the House report states " '[v]alue' does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it always imply a full going concern value. Courts will have to determine on a case-by-case basis, taking into account the facts of each case and the competing interests in the case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5854, 6312.

Not surprisingly, given this vague mandate, the courts have differed widely (if not wildly) in deciding the appropriate measure of value. Although courts generally agree the "fair market value" is the amount that would be received in a "commercially reasonable" sale, they do not agree on the standard. *3 COLLIER ON BANKRUPTCY* ¶ 506.04[2] (15th ed. 1996). At one end of the spectrum a number of courts have concluded that a creditor is entitled to a "retail value" on the theory that that is what it would cost the debtor to replace the collateral if it surrendered the asset and replaced it on the open market. Other courts have held that a "wholesale value" is appropriate since the creditor will generally dispose of the recovered collateral by selling it to a dealer or sending it to a vehicle auction.[9] The editor of COLLIER summarizes the range of possible standards as follows:

---

8. *See* cases cites *infra* note 12.

9. While there is no evidence in the record in this case of how ACC would dispose of the tractor if it regains possession, presumably it would send the recovered vehicle 'as is' to a truck auction or sell

it to a dealer. ACC is not in the business of selling tractors and apparently has no facility for cleaning up the tractor or selling it to the public at retail.

In the context of claims secured by liens on automobiles or mobile homes held by financial institutions when the debtors proposed to retain and use the subject collateral, for purposes of redemption or setting the allowed amount of secured claims in chapter 13 plans value has been determined on the bases of (a) published wholesale value, (b) the average between wholesale and retail value ... (c) published retail value, (d) retail price, less dealer overhead, commissions and profit, and (e) the 'bid' market price.[10] *3* COLLIER ON BANKRUPTCY ¶ 506.04[2] (15th ed. 1996). (citations omitted).

Many courts have adopted the wholesale valuation method at confirmation in a Chapter 13 case, especially in cases involving personal property. *General Motors Acceptance Corp. v. Mitchell (In re Mitchell)*, 954 F.2d 557 (9th Cir.1992); *In re Malody*, 102 B.R. 745 (9th Cir. BAP 1989)[11]; *In re Ferguson*, 149 B.R. 625 (Bankr.D.Idaho 1993); *In re Rossow*, 147 B.R. 1 (Bankr.W.D.N.Y.1992); *In re Goldner*, 142 B.R. 926 (Bankr.D.Idaho 1992); *Ford Motor Credit Co. v. Phillips (In re Phillips)*, 142 B.R. 15 (Bankr.D.N.H.1992); *In re Owens*, 120 B.R. 487 (Bankr.E.D.Ark. 1990); *Grubbs v. National Bank of S.C. (In re Grubbs)*, 114 B.R. 450 (D.S.C.1990); *Johnson v. General Motors Acceptance Corp. (In re Johnson)*, 115 B.R. 515 (Bankr.D.S.C. 1988); *In re Cook*, 38 B.R. 870 (Bankr. D.Utah 1984). Conversely, other courts have adopted the retail valuation method. *Metrobank v. Trimble (In re Trimble)*, 50 F.3d 530 (8th Cir.1995); *Associates Commercial Corp.*

*v. Rash (In re Rash)*, 31 F.3d ·325 (5th Cir. 1994), *modified and reh'g denied*, 62 F.3d 685 (5th Cir.1995); *Arnette v. General Motors Acceptance Corp. (In re Arnette)*, 156 B.R. 366 (Bankr.D.Conn.1993); *In re Green*, 151 B.R. 501 (Bankr.D.Minn.1993). Although these are the two main methods of valuation, other courts have opted for different valuation methods which tend to fall between wholesale or retail valuation.[12]

The bases for the different interpretations of § 506(a) stem from emphasizing either the first or second sentence of the statute. Courts favoring the wholesale method focus on the provision that an allowed claim "is a secured claim to the *extent of the value of such creditor's interest*." (emphasis added). On the other hand, courts favoring the retail valuation method focus on the provision that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property...." Despite the primary focus on different sentences of the statute, both lines of authority claim to give meaning to both.

In adopting the wholesale valuation method, one court reasoned that the first sentence of § 506(a) lends itself to wholesale value in that it defines the secured claim as the value of the "creditor's interest". Noting that the Supreme Court defined the value of the creditor's interest as "the value of the collateral" in *United Savings Association of Texas v. Timbers of Inwood Forest Associates (In re Timbers)*, 484 U.S. 365, 372, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988) (dictum)[13], the court in *In re Mitchell*, 954 F.2d 557 (9th

---

**10.** There is no clear substantive difference between (i) wholesale value, (ii) retail price, less dealer overhead, commissions and profit, and (iii) bid market price. COLLIER, *supra* at 506–38, n. 52(a).

**11.** In dicta, the court distinguishes case law in which the collateral, real property, is necessary to effectuation of the plan and indicates the vehicle at issue is not essential to the effectuation of the debtor's plan.

**12.** *See In re Myers*, 178 B.R. 518, (Bankr. W.D.Okla.1995) (average of wholesale and retail book values with adjustments based on facts of particular case); *In re Rowland*, 166 B.R. 172 (Bankr.N.D.Fla.1994) (starting point is average between retail and wholesale values with adjustments due to special circumstances); *In re Carlan*, 157 B.R. 324 (Bankr.S.D.Tex.1993) (some-

where between wholesale and retail value); *In re Stauffer*, 141 B.R. 612 (Bankr.N.D.Ohio 1992) (average NADA wholesale and NADA retail values; party can request a hearing if factors necessitate higher or lower valuation); *General Motors Acceptance Corp. v. Chapman (In re Chapman)*, 135 B.R. 11 (Bankr.M.D.Pa.1990) (average between wholesale and retail value found in official used car guide); *Dominion Bank v. Thayer (In re Thayer)*, 98 B.R. 748 (Bankr.W.D.Va.1989) (average between NADA adjusted retail and trade-in values; must show that vehicle so deteriorated or so mint that formula should not apply).

**13.** Although this is stated as dictum, numerous courts rely on this statement in their interpretation of § 506(a).

Cir.1992), concluded that it is the creditor's interest in the collateral that is being valued, not the debtor's interest. Therefore, the collateral should be measured as if it were in the hands of the creditor. Since most financing companies sell recovered collateral at auction or to a retail dealer, a wholesale value is required.

Furthermore, applying the wholesale valuation method does not ignore the second sentence of § 506(a). "The proposed disposition or use of such property" can affect value if the collateral is being used in an unusual manner. *Id.* In addition, the purpose of the valuation is defined in terms of the application of other Code sections. Valuations are made for many reasons and under all Bankruptcy Code chapters. One court addressed the different context of valuations under the code as follows:

> ... in light of all the possible valuations called for in the Bankruptcy Code, particularly Chapters 11 and 12, is that it is intended to address more significant value determination than the relatively minor league valuations required in the Chapter 13 cram-down context. In a Chapter 13 cram-down, the debtor will always have proposed retention of the collateral; otherwise, § 1325(a)(5)(B)(ii) does not apply. *In re Johnson,* 165 B.R. 524, 529 (S.D.Ga. 1994).

Likewise, in *In re Myers,* 178 B.R. 518, 523 (Bankr.W.D.Okla.1995), the court reasoned the importance of the second sentence of § 506(a) has been overemphasized because the only purpose to determine the value of a vehicle in a Chapter 13 case "is to establish the amount of the creditor's secured claim in order to permit a debtor to retain and use the property and provide for the secured claim in the Chapter 13 plan in accordance with § 1325(a)(5)(B). Otherwise, the debtor would simply surrender the property to the creditor, § 1325(a)(5)(C) would be satisfied, and any impediment to confirmation of the

debtor's Chapter 13 plan created by the creditor's secured claim would be removed."

In addition, "the purpose of valuation under Section 1325(a)(5)(B)(ii) is not to assure that a secured claimant under the plan will receive as much money as the debtors would be required to spend to replace the vehicles. Rather, the purpose is to protect a secured claimant from loss by assuring that it will receive as much money under the plan as it would receive if it were permitted to sell the vehicles in a commercially reasonable manner." *In re Malody,* 102 B.R. 745, 749 (9th Cir. BAP 1989). Moreover, the wholesale value is proper because it can safely be assumed that a creditor not in the business of selling cars sells cars at wholesale to dealers or at a vehicle auction. *In re Cook,* 38 B.R. 870, 875 (Bankr.D.Utah 1984). However, this presumption can be overcome by specific evidence demonstrating a creditor's usual method of selling cars.[14] *Id.* For example, if a jeweler routinely resells reclaimed collateral at retail prices, a retail value might be more appropriate.

A fundamental problem with a retail standard is that it implicitly includes a profit for the creditor on the "sale" of its collateral to the debtor.[15] One court concluded that using the retail value simply punishes debtor's "for doing what the Code specifically authorizes them to do—retain the property and pay to the creditor over time an amount, discounted to the present, equal to the amount which the creditor would realize if permitted to liquidate the property immediately." *In re Myers,* 178 B.R. at 523. Furthermore, it is unfair to award the creditor a premium and penalize Chapter 13 debtors. *In re Malody,* 102 B.R. at 750.

On the other hand, cases favoring the retail valuation method focus on the second sentence of § 506(a) addressing the disposition or use of the property. These courts reason that use of the retail method of valua-

---

**14.** *But see* Keith M. Lundin, 2 CHAPTER 13 BANKRUPTCY § 5.48, at 5–132 (2d ed. 1994) ("The rights of secured claim holders at confirmation in a Chapter 13 case should not depend upon the business of the holder of a claim. Surely the allowed amount of a claim secured by a car would not go up if just before confirmation the claim was traded by an ordinary commercial lender to a 'We Tote the Note' car retailer.")

**15.** Of course, even a wholesale transaction includes a profit of some kind. Otherwise, a wholesaler would go out of business.

tion "gives full effect to the entire language of § 506(a)." *In re Rash,* 62 F.3d at 685 (quoting *In re Trimble,* 50 F.3d 530 (8th Cir.1995)).

> "If the first sentence of § 506(a) were interpreted to mean that the value must be fixed at the amount which the creditor would receive on foreclosure, then the last sentence of the statute which provides that the value should be determined in light of the purpose of the valuation and of the proposed disposition or use of the property, would be surplusage." *Id.* (citing *In re Courtright,* 57 B.R. 495, 497 (Bankr.Or. 1986)).

Moreover, "a court remains faithful to the dictates of § 506(a) by valuing the creditor's interest in the collateral in light of the proposed post-bankruptcy reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to or greater than its fair market value." *Id.* In addition, courts following this line of cases generally hold hypothetical costs of sale should not be deducted because no sale will occur. *See In re McClurkin,* 31 F.3d 401 (6th Cir.1994); *In re Trimble,* 50 F.3d 530 (8th Cir.1995). Furthermore, "the loss to the creditor is not just the inability to foreclose and receive the value of the collateral, but includes the inability to foreclose and then re-lend the money to someone else." *In re Rash,* 31 F.3d 325, 329 (deleted in part as dicta), modified and reh'g denied, 62 F.3d 685 (5th Cir.1995) [16].

The court agrees with the leading authority on Chapter 13, who concludes:

> The Ninth Circuit has the better-reasoned argument. The Fifth Circuit's explanation that "profit" built into a retailer's markup is the "opportunity cost" of keeping a creditor's money tied up is economic Alice in Wonderland. Retailers certainly expect a return on their invested capital. However, retail value, especially with respect to cars and trucks is a complicated calculation only

> one aspect of which is the use value of the dealer's money.... Since when have creditors in bankruptcy (or outside) credited debtors with "retail value" when a car is repossessed or surrendered? Lenders and sellers build the risk of default and the risk of bankruptcy into the interest rates they charge, the prices at which they sell, and the transaction costs that they charge. To allow sellers and financiers to recover the retail or replacement cost of personal property in Chapter 13 cases is to twice compensate for the risk of non-payment. Lienholders in Chapter 13 cases are already guaranteed "present value" at confirmation under § 1325(a)(5)(B)(ii). Chapter 13 is supposed to be a rehabilitative chapter, favored by Congress over other forms of consumer bankruptcy. This purpose is lost entirely in the Fifth Circuit's analysis of §§ 506(a) and 1325(a)(5). Keith M. Lundin, 2 CHAPTER 13 BANKRUPTCY § 5.48, p. 307 (Supp.1995).

Lundin's summary is persuasive: using a wholesale value standard without deducting for costs of sale, foreclosure etc. gives meaning to all parts of the statute and clearly reflects the a balancing of the interests of all parties to the chapter 13 process. The wholesale value also most closely reflects the economic reality that most creditors engaged in the business of financing vehicles do not engage in retail sales of repossessed collateral but rather simply send the vehicle recovered to the auction for immediate sale. Thus the Court concludes that it must apply a wholesale valuation standard in cases of this type involving vehicles.[17]

Having concluded as a matter of law that the wholesale sale standard is applicable, the Court must turn to the actual wholesale value, a question of fact. Here, the Court concludes, based on its view of the credibility of the various valuation witnesses that the debtor's valuation, however unscien-

---

16. The opinion on rehearing is peculiar. Not only does one of the judges switch positions (and dissent) but the majority, apparently to bolster its conclusion, cites a long string of cases—many of which relate to sales of real estate and simply do not support the conclusion that the retail valuation method is the proper standard.

17. Again, the creditor retains the option to offer evidence that it sells recovered collateral at retail prices in cases involving other types of personal property collateral.

tific, is the most credible. Generally, the court believes that it must review the testimony, the credibility of the witnesses and all supporting evidence and accept *one* of the proffered values. It recognizes that a number of courts typically hear all the experts and then arrive at a value somewhere in the range offered. Logically, this approach makes no sense.[18] In effect, the court is believing both (or all) of the experts testifying. Logically, the Court should determine which of the experts is most credible and accept the value suggested by that person. Generally, an expert is offered to assist the trier of fact in determining a fact in issue. Fed.R.Evid. 702. No court would hear two experts' evidence on DNA test results and conclude that the both were half right and make a finding on that basis. No court hears experts on causation and finds that the defendant "sort of" caused the injury. In all other situations, the court accepts one of the sets of experts' evidence and rules for or against the proponent on the fact issue involved. Simple logic compels a similar result on valuation issues. This Court will, generally, make every effort to determine which of the expert valuations is most credible, in light of all available evidence, and accept that expert's valuation.

Other considerations are also relevant. While settlement negotiations do not affect the findings of the court, they do affect the posture the case is in when it reaches trial. If the parties are aware that the court routinely averages the proffered values in making its own independent valuation, they tend to try to influence that process by setting their value higher or lower. The result is that prior to trial, the parties typically get farther and farther apart on value.[19] This makes settlement less likely.

■ One further comment is necessary here. In this and other cases, considerable discussion takes place about the usefulness of NADA and other market guide prices for various types of personal property. Market guides are admissible under a specific exception to the hearsay rules. Fed.R.Evid. 803(17). Some courts rely on these market reports while others use them as indicia of the range of values and require additional specific evidence to determine actual value. One court held: "a secured claim in a vehicle should be valued at the average of NADA wholesale and retail value. A party may request an evidentiary hearing if it believes certain factors necessitate a higher or lower value." *In re Stauffer*, 141 B.R. 612, 614 (Bankr.N.D.Ohio 1992). This approach is appropriate if a rough guide or quick settlement method is the goal. The court cannot place exclusive reliance on market guides, since, as another court stated "exclusive reliance on industry averages ... contradict[s] the Court's duty under § 506(a) to determine the value of the specific collateral in the case before it." *In re Johnson*, 165 B.R. 524, 529 (S.D.Ga.1994).

■ Properly, market reports should be used in conjunction with expert testimony based on an actual inspection of the property. However, the use of a market report on its own is not favored. "In most cases it is difficult to imagine setting a reliable valuation without, for instance, some first hand testimony as to the condition of the collateral." *In re Damron*, 8 B.R. 323, 325 (Bankr. S.D.Ohio 1980). "[T]here are an infinite number of variables which make it difficult to rely on such values without further inquiry." *Id.* Likewise, one court stated:

> Ascertaining "fair market value" is an objective broad enough to permit use of NADA guidebooks and similar authoritative sources as evidence of value, but without implying that the valuation determina-

---

18. This averaging approach is generally unassailable on appeal as long as the valuation "found" by the trial court is within the range of the evidence as actual value is a question of fact. *Cf. In re Arnold and Baker Farms*, 177 B.R. 648 (9th Cir. BAP 1994) (stating property valuation is a question of fact and upholding the finding of a value of land at $7,300 per acre based on the creditor's estimate of $1,381 per acre and the debtor's estimate ranging up to $8,631 per acre.)

19. In those cases where this Court has directed appointment of a court expert under Fed.R.Evid. 706, the court generally assesses the cost against the party whose initial position was farthest from the value eventually found by the Court. This encourages the parties to take a realistic approach to valuation of the property in issue up front—which also *tends to* encourage settlement.

tion is limited to those sources. Thus, the debtor(s) and the secured creditor may offer NADA guidebooks (along with any other relevant evidence) to support their contentions regarding the subject property's fair market value; the Court is not confined, however, to a given column and line within the guidebook in reaching its value determination. Applying common sense and personal experience with similar valuations, the judge must reach a fair market value determination based on the totality of the relevant evidence tendered. *In re Johnson,* 165 B.R. at 530.

In sum, if the parties want to use the various market reports to guide the negotiations, fine, but valuation is still a question of fact and not a matter of looking up a number in a table and dropping it in a blank in an order.

Here, the Court may accept the debtor, the debtors' expert or the creditor's expert. Based on its observation of the testimony and the evidence offered, the Court finds that the debtor's assessment of the value of his truck in the wholesale market is most credible.

### CONCLUSION

For the foregoing reasons, the Court concludes that as a matter of law, a wholesale valuation method is mandated by the provisions of Chapter 13 applicable here and that the value of the vehicle in issue under that standard is $25,000. As the plan proposes to pay at least that amount, it may be confirmed.

THEREFORE, IT IS ORDERED that the debtors' vehicle shall be valued at its wholesale value, and the debtors' plan shall be confirmed.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a) and Fed.R.Bankr.P. 7052. A separate judgment will be entered giving effect to the determinations reached herein.

### *JUDGMENT ON DECISION CONFIRMING CHAPTER 13 PLAN*

The above captioned case is before the Court for ruling on the standard of valuation properly applied to determine confirmation of the debtors' plan under 11 U.S.C. § 1325(a)(5)(B). The Honorable John K. Pearson, United States Bankruptcy Judge, presiding. The matter having been heard by the Court, a decision having been rendered, and an order on that decision entered.

IT IS ORDERED that the debtors' vehicle shall be valued at its wholesale value, and the debtors' plan shall be confirmed according to 11 U.S.C. § 1325(a)(5)(B).